Harry B. Frank, J.
Defendants Random House, Inc. and John Keats, the publisher and author respectively of a biography entitled “ Howard Hughes ”, seek summary judgment dismissing the complaint.
*2 The plaintiff Bosemont Enterprises, Inc., is identified in the complaint as a corporation engaged “ in the business of developing and acquiring literary and dramatic properties and rights, biographical material and the right to use such material * * * for purposes of trade, and producing, publishing and otherwise using the same for profit ’ The basis for the present action is an alleged agreement between Bosemont and Howard Hughes, characterized in a related copyright litigation as a person ‘ ‘ who by reason of his remarkable exploits and achievements, primarily in the aviation and motion picture fields, had become quite a public figure ” (see Rosemont Enterprises v. Random House, 366 F. 2d 303, 305 [C. A. 2d]).
While the findings with respect to the temporary injunction sought in the afore-noted Federal copyright infringement action are not here binding (see Walker Mem. Baptist Church v. Saunders, 285 N. Y. 462, 474), the factual background gleaned from that proceeding is helpful in understanding the present controversy.
From the opinions in that case it appears that Bandom House began preparations for its biography in September, 1962 and that Hughes, who (p. 309) “ has almost an obsession as to his privacy,” learned of the project in 1965, resulting in a warning to Bandom House that he was opposed to the biography and (p. 305) “would make trouble if the book was published.” Shortly thereafter, in September, 1965, the plaintiff corporation, Bosemont, was organized by close associates of Hughes for the ostensible purpose of preparing an authorized biography of his life. Its subsequent operations, however, indicate that its primary function was to prevent the publication of biographical material which Hughes could not control and, in particular, the Bandom House biography. An example of its activities in furtherance of such goal was its acquisition on May 20, 1966, of copyrights on a series of articles about Hughes which had appeared in Look magazine in early 1954, and its institution of the copyright infringement action a scant six days thereafter “ not with a desire to protect the value of the original writing but to suppress the Bandom House biography because Hughes wished to prevent its publication.” (See Rosemont Enterprises v. Random House, supra, concurring opn. p. 313.)'
As Judge Moore, speaking for the court, so aptly phrased it (p. 305), Hughes has “ a publicized passion for personal anonymity ” and it is his predilection therefor which is at the heart of the present controversy as well as its related litigations.
The complaint in the present action alleges that plaintiff corporation entered into an agreement with Hughes whereby it *3 acquired 1 ‘ the sole and exclusive world-wide rights to exploit commercially in any manner the name, personality, likeness or the life story or incidents in the life of Hughes ” and that such exclusive rights “ have unique and great commercial value”.
Predicated upon its rights under such agreement, plaintiff asserts three causes of action.
The first cause of action alleges that defendants entered into a scheme “ to exploit commercially the name, likeness and personality of Hughes without the consent of either Hughes or plaintiff and to capitalize upon the achievements of Hughes and upon his life story or incidents therein ’ ’ and that in furtherance of said scheme “ and solely for the purposes of trade, and * * # creating a profit for themselves ” defendants have agreed to write and publish ‘ ‘ a book which would not be written or published in order to disseminate newsworthy information but * * * in such manner as to use and exploit commercially the name, likeness and personality of Hughes ”. Plaintiff further complains that “ defendants have not made a bona fide effort to assemble facts for the purpose of informing the public as to Hughes or his life story ’ ’, followed by allegations that defendants have chosen to ignore plaintiff’s exclusive rights and are preparing a book for publication and sale to the general public in the immediate future and that any such book ‘ ‘ would impair the market for an authoritative biography of Hughes ” and would otherwise interfere with and infringe upon the valuable rights plaintiff acquired under its agreement with Hughes and its valuable property interest therein.
The second cause of action charges that defendant’s book violates Hughes’ right of privacy under article 5 of the Civil Bights Law with resultant injury to plaintiff’s rights.
In the third cause of action a declaratory judgment is sought in the premises.
The precise nature of the first cause of action is somewhat obscure and understandably prompted the District Court Judge in the copyright suit to observe that the issues herein ‘1 are not at all clear ”. Indeed, such first cause of action seems to consist of a combination of diverse allegations relating to several separate and distinct legal concepts which are all woven together into some not easily decipherable hybrid.
Thus the various allegations condemning defendants ’ publication, at all, of a book about Hughes are on the one hand couched in terms of defendants’ scheme “ to exploit commercially ” for “ profit ” and “ solely for the purposes of trade ’’which appears to fall within the language of the New York “ privacy statute ”, and on the other hand stress is placed upon the appropriation *4 or infringement of plaintiff’s “ valuable property interest ” of “great commercial value ” in its exclusive rights to exploit commercially the name, personality and likeness of Hughes which would have relevance to the separately recognized ‘ * right of publicity.” (See Haelan Labs. v. Topps Chewing Gum, 202 F. 2d 866; Gordon, Right of Property in Name, Likeness, Personality and History, 55 Nw. U. L. Rev. 553, 569-571.)
To the extent that the first cause of action seeks relief predicated upon either Hughes’ “ right of privacy ” or his “ right of publicity ” it is fatally defective.
While considerations of social desirability may in the past have prompted a liberal construction of our statutorily derived “ right of privacy” despite troublesome confrontations with constitutionally protected areas of speech and press, the permissible limits of such “right” have now been clearly and decisively drawn. (See Time, Inc. v. Hill, 385 U. S. 374.)
A public figure, whether he be such by choice or involuntarily, is subject to the often-searching beam of publicity and, in balance with the legitimate public interest, the law affords his privacy little protection (Spahn v. Julian Messner, Inc., 18 N Y 2d 324, 328).
That Howard Hughes falls within the category of a public figure is not seriously open to dispute. His actions and dealings have engendered considerable public interest and he has long been a newsworthy personality. (See Rosemont Enterprises v. Random House, 366 F. 2d 303, 309, supra.) Indeed, his standing as a public figure has been admitted by plaintiff’s counsel in depositions before trial, and the allegations of the complaint here in issue make his status in that regard clear.
The dominance of the public interest in obtaining information about public figures received early recognition in the construction of the New York privacy statute and publications of factual or biographical information about such persons have usually been held to be outside the protection of the statute. (See, for example, Jeffries v. New York Evening Journal Pub. Co., 67 Misc. 570; Sidis v. F-R Pub. Corp., 113 F. 2d 806; Malony v. Roy Comics Publishers, 277 App. Div. 166.)
That the New York statute gives a public figure no right to suppress truthful accounts of his life is now settled in the most unequivocal terms, both by the Court of Appeals of this State and the United States Supreme Court (Spahn v. Julian Messner, Inc., supra; Time, Inc. v. Hill, 385 U. S. 374, supra). The latter has held not only that the factual reporting of newsworthy persons and events falls within the constitutional protections for speech and press, but also that no redress is available even *5 for material and substantial falsification in such reporting in the absence of proof that the report was published with knowledge of its falsity or in reckless disregard of the truth. This burden upon the individual, even of false exposure, is held to be “ an essential incident of life in a society which places a primary value on freedom of speech and of press.” (Time, Inc. v. Hill, supra, pp. 387-388.)
While plaintiff’s brief in the instant case is liberally sprinkled with charges of “ plagiarism ”, and “ reckless disregard of the truth ”, there is not a single showing of any specific misrepresentation of fact or of false or untruthful statements. Instead, plaintiff asserts that it is seeking “ relief on account of the conduct of defendants and not the contents of their book ” and it contends that ‘£ its position does not depend upon establishing the truth or falsity of any portion of the book ” but rather that the protection of the First Amendment is lost when a defendant engages ££ in flagrant and unreasonable violations of publishing practices and customs normally adhered to by responsible publishers amounting in effect to reckless disregard of the facts.” This is accompanied by a broadside of outrage in which defendants are castigated for ££ publishing as a biography a work based on no real research, no interviews and no bona fide investigation ”, for failing “ to meet minimum standards which normally obtain in the * * * preparation of biographies ”, for using “ a totally inexperienced writer ” and for otherwise departing from procedures followed in the publishing industry generally and ££ from what Random House has done in preparing biographies of other public figures.”
While plaintiff’s condemnation of the literary merit and creative standards used in producing defendants’ book might be of interest in a critique of the work appearing in a book review section, such arguments are wholly irrelevant in the present context. Under Time, Inc. v. Hill (supra), only proof of knowing fictionalization or falsity would be sufficient to afford redress in the case of otherwise constitutionally protected material such as a biography. This requires, in the first instance, a showing that the work “ is infected with material and substantial falsification ” (Spahn v. Julian Messner, Inc., 21 N Y 2d 124, 127), but plaintiff has made no such showing beyond unsupported allusions in its brief to unspecified “ reckless disregard of the facts ”, which is wholly inadequate (cf. Estate of Hemingway v. Random House, 49 Misc 2d 726, affd. 25 A D 2d 719). If plaintiff had demonstrated material and substantial falsification, then the standards used in compiling the book might be of significance, but only on the issue of defendants’££ knowledge ” or “ reckless *6 disregard ” of such falsification. (See Spahn v. Messner, supra, pp. 127-128.) Where, however, as is here the case, there is no showing at the outset of any falsity, the question of ‘ ‘ knowledge ” is never reached, and abstract indictments of defendants’ literary standard and esoteric discussions distinguishing “hot news ” from other published material are wholly without meaning.
The biography of Howard Hughes, published by defendants herein, irrespective of its literary merit or style (see Rosemoni Enterprises v. Random House, supra, p. 307) falls within those “ reports of newsworthy people or events ” which are constitutionally protected and which are outside the proscription of the New York “ right of privacy ” statute. The allegation that the book was published for ‘ ‘ purposes of trade ’ ’ and profit does not, as plaintiff seeks to imply, alter its protected status. The publication of a newspaper, magazine, or book which imparts truthful news or other factual information to the public does not fall within “ the purposes of trade.” contemplated by the New York statute, even though such publication is published and sold for a profit. (See Time, Inc. v. Hill, supra, p. 397; Sidis v. F-R Pub. Corp., supra, p. 810; Rosemont Enterprises v. Random House, supra, p. 308.)
The remaining ground on which plaintiff seeks to justify this suit is the assignment to it of Hughes ’ ‘ ‘ right of publicity ’ ’. This is a right that recognizes the pecuniary value which attaches to the names and pictures of public figures, particularly athletes and entertainers, and the right of such people to this financial benefit. It is not, however, every public use of a prominent person’s name that he has a right to exploit financially. It is the unauthorized use in connection with the sale of a commodity for advertising purposes which is recognized as an actionable wrong under New York law. The same requirement of commercial use which limits the New York right of privacy inheres in the “ right of publicity ”. (Chaplin v. National Broadcasting Co., 15 F. R. D. 134; cf. Haelan Labs. v. Topps Chewing Gum, 202 F. 2d 866, supra.) The publication of a biography is clearly outside the ambit of the ‘1 commercial use ’ ’ contemplated by the ‘ ‘ right of publicity ’ ’ and such right can have no application to the publication of factual material which is constitutionally protected. Just as a public figure’s “ right of privacy ” must yield to the public interest so too must the ‘ ‘ right of publicity ’ ’ bow where such conflicts with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest.
Because of such considerations, a public figure can have no exclusive rights to his own life story, and others need no consent *7 or permission of the subject to write a biography of a celebrity. (See Hofstadter & Horowitz, The Right of Privacy, p. 59; Jeffries v. New York Evening Journal Pub. Co., 67 Misc. 570; Koussevitzky v. Allen, Towne & Heath, 188 Misc. 479, affd. 272 App. Div. 759.)
In addition to the foregoing it must be noted that plaintiff, in any event, has no standing to assert another’s right of privacy under article 5 of the New York Civil Rights Law which is specifically relied upon in its complaint. Plaintiff is alleging an invasion of Hughes’ right of privacy, but such right is a purely personal one which may be enforced only by the party himself. (See Chaplin v. National Broadcasting Co., 15 F. R. D. 134, 139-140, supra; Murray v. Cast Lithograph & Engravmg Co., 8 Misc. 36, affd. 10 Misc. 365; Wyatt v. Hall’s Portrait Studio, 71 Misc. 199.) Thus, even if this biography infringed any of Hughes’ rights, and such is not here the case, plaintiff would have no rights with respect thereto.
Accordingly, the motion is granted dismissing the complaint in its entirety.