[L.A. No. 30872. Dec. 5, 1979.]

JEAN GUGLIELMI, Plaintiff and Appellant, v.
SPELLING-GOLDBERG PRODUCTIONS et al., Defendants and
Respondents.

COUNSEL

Rudin & Perlstein and Vincent H. Chieffo for Plaintiff and Appellant.

Lillick, McHose & Charles, Kenneth E. Kulzick, Lawrence W. Dam and Kathleen Hallberg for Defendants and Respondents.

Selvin & Weiner and Paul P. Selvin as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**THE COURT.**—Appellant allegedly is the nephew of the actor Rudolph Valentino, who died in 1926. According to the complaint herein, in 1975, respondents exhibited on television a "fictionalized version" of Valentino's life, depicting the actor's name, likeness and personality without obtaining the prior consent of either Valentino or appellant. In the present action, appellant seeks damages and injunctive relief on the theory that respondents have misappropriated Valentino's "right of publicity," and that appellant as Valentino's legal heir is the present owner of that right. Respondents' demurrer to the complaint was sustained and, upon appellant's refusal to amend, the complaint was ordered dismissed. This appeal followed.

In *Lugosi* v. *Universal Pictures, ante,* page 813 [160 Cal.Rptr. 323, 603 P.2d 425], we hold that the right of publicity protects against the unauthorized use of one's name, likeness or personality, but that the right is not descendible and expires upon the death of the person so protected. *Lugosi* controls the disposition of the present case and makes it unnecessary to discuss any further issues raised by the parties.

The judgment is affirmed.

**BIRD, C. J.,** Concurring.—This court must decide whether the use of a deceased celebrity's name and likeness in a fictional film exhibited on television constitutes an actionable infringement of that person's right of publicity. It is clear that appellant's action cannot be maintained. Therefore, the trial court properly dismissed his complaint.

I

In his complaint, appellant alleges that Rudolpho Guglielmi, also known as Rudolph Valentino, was his paternal uncle. Valentino was a world-renowned silent motion picture actor who created substantial commercial value in his identity through his motion picture performances. Appellant contends that Valentino had a protectible proprietary interest in the commercial uses of his name, likeness and personality. Appellant alleges that he inherited this right of publicity under Valentino's will, following Valentino's death in 1926.

On November 23, 1975, respondents exhibited on the television network owned by American Broadcasting Companies, Inc., a film entitled *Legend of Valentino: A Romantic Fiction.* Appellant alleges that "[s]aid film purports to represent a portion of the life of Rudolph Valentino and employs the name, likeness and personality of Rudolph Valentino." However, appellant asserts that while the principal character is identified as Valentino, the film is "a work of fiction about the life and loves of an Italian actor who became Hollywood's first romantic screen star and who died at the height of his fame." Hence, the film is a "fictionalized version of Rudolph Valentino's life." Appellant alleges that respondents knew that the film did not truthfully portray Valentino's life, and that the film was made without Valentino's or appellant's consent. Appellant contends that respondents also used Valentino's name, likeness and personality in advertising the film "to solicit and to sell commercial sponsorship exhibited in conjunction with the exhibition of said film and to solicit viewers for the exhibition of said film."

Appellant argues that by incorporating Valentino's identity in the film and related advertisements, respondents "were able to derive greater income from their film by attracting more viewers and sponsors than they would have ..." if Valentino's name had not been used. This unauthorized use in a "work of fiction" which respondents knew was not an accurate portrayal of Valentino's life allegedly constituted a misap-

propriation of Valentino's right of publicity.[1] For this allegedly tortious conduct, appellant seeks damages and injunctive relief.[2]

Respondents demurred to appellant's complaint, asserting that it failed to state facts sufficient to constitute a cause of action. The trial court sustained the demurrer with leave to amend. However, the court offered to sustain the demurrer without leave to amend and dismiss the complaint if appellant wished to challenge the court's ruling. Appellant elected to stand on the unamended complaint and his complaint was dismissed. This appeal followed.

## II

In reviewing the sufficiency of a complaint following a trial court's sustaining of a general demurrer, the allegations in the complaint are assumed to be true. (*Gill* v. *Curtis Publishing Co.* (1952) 38 Cal.2d 273, 275 [239 P.2d 630]; *Hendrickson* v. *California Newspapers, Inc.* (1975) 48 Cal.App.3d 59, 61 [121 Cal.Rptr. 429].) If the allegations so construed state any cause of action, then a trial court commits error when it sustains a demurrer and dismisses the complaint.[3]

The gravamen of appellant's complaint is that respondents used Valentino's name, likeness and personality in a fictionalized film which

---

[1]In his petition for hearing, appellant summarized his claim: "In essence, Petitioner alleges that defendants have created a 'product,' a fictionalized photoplay, into which, for their own gain, they appropriated the name, likeness, and identity of Rudolph Valentino in order to make their product commercially viable and to ensure a 'sale' of their product."

[2]Specifically, appellant prayed for a permanent injunction restraining respondents from "commercially exhibiting ... any false, untrue, fictionalized or fabricated film which purports to depict a portion of the life of Rudolph Valentino and/or which embodies the use of the name, likeness, and reputation of Rudolph Valentino," and "from using the name, likeness or reputation of Rudolph Valentino in any manner for the purposes of advertising any film, product, or services or for the purposes of solicitation of commercial advertising for any film, product, or services ...."

[3]The description of respondents' conduct and state of mind set forth in section I, *ante*, was drawn from appellant's complaint and subsequent submissions in this action. While the sufficiency of the complaint must be judged on the allegations therein, this court may consider admissions in appellant's subsequent submissions in determining the factual basis of his contentions. (*Zumbrun* v. *University of Southern California* (1972) 25 Cal.App.3d 1, 7 [101 Cal.Rptr. 499, 51 A.L.R.3d 991]; *Hospelhorn* v. *Newhoff* (1941) 43 Cal.App.2d 678, 679-680 [111 P.2d 688]. Cf. *Browne* v. *Superior Court* (1940) 16 Cal.2d 593, 598-599 [107 P.2d 1, 131 A.L.R. 276]; *Clyne* v. *Clyne* (1964) 228 Cal.App.2d 597, 598, fn. 1 [39 Cal.Rptr. 677].)

did not accurately portray his life. They thereby infringed on appellant's inherited interest in Valentino's right of publicity. Appellant seeks recovery of the amounts respondents were unjustly enriched by the unauthorized use of Valentino's right of publicity and damages for diminishing its value. No claim was made that respondents' fictional work defamed or invaded the privacy of either Valentino or appellant.[4] Therefore, appellant's complaint states a cause of action if two conditions are satisfied: (1) Rudolph Valentino had a right of publicity in the commercial uses of his name, likeness and personality, a right which could be transferred to his heirs, and (2) respondents' conduct constituted an impermissible infringement on that right.

In light of my conclusions in *Lugosi* v. *Universal Pictures, ante,* page 813 [160 Cal.Rptr. 323, 603 P.2d 425] (dis. opn.), I believe that plaintiff's complaint satisfies the first condition. In *Lugosi,* I examined the nature of an individual's interest in controlling commercial uses of his name and likeness. A prominent person has a substantial economic interest in the commercial use of his name and likeness. This is entitled to protection under the common law and should be inheritable by an individual's heirs and protected for 50 years after the individual's death. Valentino was a world-renowned silent screen star who expended considerable effort in developing his career. Unquestionably he enjoyed the protection afforded by the common law right of publicity.[5] Since the complaint alleges that appellant inherited Valentino's interest in his name and likeness and that the appropriation of Valentino's right of publicity occurred within 50 years of Valentino's death, the initial elements of a cause of action have been adequately alleged.

It must therefore be determined whether respondents' conduct constituted an infringement of Valentino's right of publicity. In resolving that question, the context and nature of the use is of preeminent concern. Valentino's name and likeness were allegedly used in a work of fiction

---

[4]There was no allegation that *appellant's* name or likeness was used in respondents' film. Appellant recognizes that any injury to Valentino's personal rights, such as his right to privacy, would not be actionable after his death. (See, e.g., *Hendrickson* v. *California Newspapers, Inc., supra,* 48 Cal.App.3d at p. 62.)

[5]Valentino had a right of publicity in his name and likeness. In light of the disposition of this appeal, I need not decide whether any right of publicity would attach to Valentino's "personality." It is interesting to note, however, that appellant has not provided—and I find it difficult to discern—any easily applied definition for this amorphous term.

broadcast on television. Appellant characterized respondents' film as "a work of fiction about the life and loves of an Italian actor who became Hollywood's first romantic screen star and who died at the height of his fame." Valentino was identified as that character.[6]

Film is a "significant medium for the communication of ideas." (*Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 501 [96 L.Ed. 1098, 1105, 72 S.Ct. 777].) Whether exhibited in theaters or on television, a film is a medium which is protected by the constitutional guarantees of free expression. (U. S. Const., 1st and 14th Amends.; Cal. Const., art. I, § 2; *Joseph Burstyn, Inc.* v. *Wilson, supra,* 343 U.S. at pp. 501-502 [96 L.Ed. at pp. 1105-1106]; *Red Lion Broadcasting Co.* v. *FCC* (1969) 395 U.S. 367, 386-390 [23 L.Ed.2d 371, 386-389, 89 S.Ct. 1794]; *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 242 [49 Cal.Rptr. 537, 411 P.2d 289].) A film is presumptively protected (*People* v. *Superior Court (Freeman)* (1975) 14 Cal.3d 82, 88 [120 Cal.Rptr. 697, 534 P.2d 393]), and will forfeit that protection only if it falls within "narrowly limited classes" of cases (*Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 571 [86 L.Ed. 1031, 1035, 62 S.Ct. 766]).

Appellant contends that the Valentino film is not entitled to the cloak of constitutional protection because respondents incorporated Valentino's name and likeness in: (1) a work of fiction, (2) for financial gain, (3) knowing that such film falsely portrayed Valentino's life. The critical issue is whether the presence of these factors, individually or collectively, sufficiently outweighs any protection this expression would otherwise enjoy under the United States and California Constitutions.

In emphasizing the fictional nature of the film, appellant's argument reveals a fundamental misconception of the nature of the constitutional

---

[6]Such statements establish that this is not a case in which the use is wholly unrelated to the individual. A different result may follow if, for example, respondents had published Rudolph Valentino's Cookbook and neither the recipes nor the menus described in the book were in any fashion related to Rudolph Valentino. (Cf. *Grant* v. *Esquire* (S.D.N.Y. 1973) 367 F.Supp. 876; *Gill* v. *Hearst Publishing Co.* (1953) 40 Cal.2d 224 [253 P.2d 441]; *Leverton* v. *Curtis Pub. Co.* (3d Cir. 1951) 192 F.2d 974.)

While Valentino's name was allegedly used to advertise this particular film, this is not a case in which a celebrity's name is used to promote or endorse a collateral commercial product or is otherwise associated with a product or service in an advertisement. (See, e.g., *Stilson* v. *Reader's Digest Assn. Inc.* (1972) 28 Cal.App.3d 270 [104 Cal.Rptr. 581]; *Motschenbacher* v. *R. J. Reynolds Tobacco Company* (9th Cir. 1974) 498 F.2d 821; *Lombardo* v. *Doyle, Dane & Bernbach, Inc.* (1977) 58 App. Div.2d 620 [396 N.Y.S.2d 661].)

guarantees of free expression. "The constitutional right of free expression ... is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." (*Cohen* v. *California* (1971) 403 U.S. 15, 24 [29 L.Ed.2d 284, 293, 91 S.Ct. 1780].)

The First Amendment and article I, section 2 of the California Constitution serve "to preserve an uninhibited marketplace of ideas" and to repel efforts to limit the "'uninhibited, robust and wide-open' debate on public issues." (*Red Lion Broadcasting Co.* v. *FCC, supra,* 395 U.S. at p. 390 [23 L.Ed.2d at p. 389]; *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997].) These rights are essential in a democratic system of government. Free speech is also guaranteed because of our fundamental respect for individual development and self-realization. The right to self-expression is inherent in any political system which respects individual dignity.[7] Each speaker must be free of government restraint regardless of the nature or manner of the views expressed unless there is a compelling reason to the contrary. (See Hill, *Defamation and Privacy Under the First Amendment* (1976) 76 Colum.L.Rev. 1205, 1208-1210.)

Free speech encompasses the discussion of "all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." (*Thornhill* v. *Alabama* (1940) 310 U.S. 88, 102 [84 L.Ed. 1093, 1102, 60 S.Ct. 736].) Participation in the process of self-government requires knowledge of more than current events and political candidates. The information required to establish basic values and to order political priorities is essential.

---

[7]See *Cohen* v. *California, supra,* 403 U.S. at pages 24-26 [29 L.Ed.2d at pages 293-295]; *Whitney* v. *California* (1927) 274 U.S. 357, 375-376 [71 L.Ed. 1095, 1105-1106, 47 S.Ct. 641] (conc. opn. of Brandeis, J.). See generally, Tribe, American Constitutional Law (1978) pages 578-579; Nimmer, *The Right to Speak From Times to Time: First Amendment Theory Applied to Libel and Misapplied to Privacy* (1968) 56 Cal.L.Rev. 935, 949; Emerson, *Toward A General Theory of The First Amendment* (1963) 72 Yale L.J. 877, 878-881.

Freedom of expression also encompasses the *manner* in which the ideas, thoughts and beliefs are expressed.[8] The epigram as well as the philosophical treatise, the dispassionate analysis as well as the emotion-charged tirade, may be communicated. (See *Cohen* v. *California, supra,* 403 U.S. 15; *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 689-690 [150 Cal.Rptr. 258, 586 P.2d 572] (dis. opn. of Bird, C. J.).) To limit how one speaks not only impedes self-expression but diminishes the public dialogue so essential to a free people.

Our courts have often observed that entertainment is entitled to the same constitutional protection as the exposition of ideas.[9] That conclusion rests on two propositions. First, "[t]he line between the informing and the entertaining is too elusive for the protection of the basic right. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another doctrine." (*Winters* v. *New York* (1948) 333 U.S. 507, 510 [92 L.Ed. 840, 847, 68 S.Ct. 665].) Second, entertainment, as a mode of self-expression, is entitled to constitutional protection irrespective of its contribution to the marketplace of ideas. "For expression is an integral part of the development of ideas, of mental exploration and of the affirmation of self. The power to realize his potentiality as a human being begins at this point and must extend at least this far if the whole nature of man is not to be thwarted. [¶] Hence suppression of belief, opinion and expression is an affront to the dignity of man, a negation of man's essential nature." (Emerson, *supra,* 72 Yale L.J. at p. 879.)

It is clear that works of fiction are constitutionally protected in the same manner as political treatises and topical news stories.[10] Using fiction as a vehicle, commentaries on our values, habits, customs, laws, prejudices, justice, heritage and future are frequently expressed. What

---

[8]It is noteworthy that the California Constitution provides that "[e]very person may freely speak, write and publish his or her sentiments on all subjects . . . . ." (Art. I, § 2.) As Webster confirms, "sentiments" encompasses not only thoughts but the attendant emotions. (Webster's New Internat. Dict. (2d ed. 1941) p. 2280.)

[9]See, e.g., *Zacchini* v. *Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562, 578 [53 L.Ed.2d 965, 978, 97 S.Ct. 2849]; *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 535, footnote 6 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]; *Weaver* v. *Jordan, supra,* 64 Cal.2d at page 242; *Gill* v. *Hearst Publishing Co., supra,* 40 Cal.2d at page 229.

[10]See *Cohen* v. *California, supra,* 403 U.S. at pages 25 [29 L.Ed.2d at pages 293-294]; *Katzev* v. *County of Los Angeles,* (1959) 52 Cal.2d 360, 365 [341 P.2d 310];

may be difficult to communicate or understand when factually reported may be poignant and powerful if offered in satire, science fiction or parable. Indeed, Dickens and Dostoevski may well have written more trenchant and comprehensive commentaries on their times than any factual recitation could ever yield. Such authors are no less entitled to express their views than the town crier with the daily news or the philosopher with his discourse on the nature of justice. Even the author who creates distracting tales for amusement is entitled to constitutional protection. (See *Berlin* v. *E.C. Publications, Inc.* (2d Cir. 1964) 329 F.2d 541, 545; Hill, *supra,* 76 Colum.L.Rev. at p. 1308.)

Thus, no distinction may be drawn in this context between fictional and factual accounts of Valentino's life. Respondents' election of the former as the mode for their views does not diminish the constitutional protection afforded speech. If respondents are to be held liable for their expression, a more persuasive basis must be established.

Next, appellant contends that Valentino's name and likeness were used because they increased the value or marketability of the film. It is argued that such motivation diminishes the constitutional protection otherwise mandated. This contention appears to encompass three distinct bases of liability. First, the film was produced and broadcast for profit. Second, respondents could have expressed themselves without using Valentino's name and likeness. To permit such unauthorized use allows them to benefit unjustifiably from Valentino's prominence. Third, the use of Valentino's name and likeness in a *fictional* account poses a unique threat to the value of Valentino's right of publicity.

The first argument can be readily dismissed. The First Amendment is not limited to those who publish without charge. Whether the activity involves newspaper publication or motion picture production, it does not lose its constitutional protection because it is undertaken for profit. (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 397 [17 L.Ed.2d 456, 472, 87 S.Ct. 534]; *Joseph Burstyn, Inc.* v. *Wilson, supra,* 343 U.S. at p. 502 [96 L.Ed. at p. 1106].) The fact that respondents sought to profit from

---

*University of Notre Dame* v. *Twentieth Century-Fox* (1965) 22 App.Div.2d 452 [256 N.Y.S.2d 301, 307], affirmed 15 N.Y.2d 940 [259 N.Y.S.2d 832, 207 N.E.2d 508]. Cf. *Minarcini* v. *Strongsville City School Dist.* (6th Cir. 1976) 541 F.2d 577 (removal of novels by Joseph Heller and Kurt Vonnegut from school library unconstitutional); *Right to Read Defense Com.* v. *School Com., Etc.* (D.Mass. 1978) 454 F.Supp. 703 (removal of anthology of prose and poems from school library unconstitutional).

the production and exhibition of a film utilizing Valentino's name and likeness is not constitutionally significant.

The second prong of appellant's argument is more subtle. In essence, it is that the use of Valentino's name and likeness in the film was unnecessary, that Valentino's identity was incorporated in the film solely to increase the film's value. If this analysis were used to determine whether an expression is entitled to constitutional protection, grave harm would result. Courts would be required not merely to determine whether there is some minimal relationship between the expression and the celebrity (see fn. 6, *ante*), but to compel the author to justify the use of the celebrity's identity. Only upon satisfying a court of the necessity of weaving the celebrity's identity into a particular publication would the shadow of liability and censorship fade. Such a course would inevitably chill the exercise of free speech—limiting not only the manner and form of expression but the interchange of ideas as well.

Contemporary events, symbols and people are regularly used in fictional works.[11] Fiction writers may be able to more persuasively, or more accurately, express themselves by weaving into the tale persons or events familiar to their readers. The choice is theirs. No author should be forced into creating mythological worlds or characters wholly divorced from reality. The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire. Rather, prominence invites creative comment. Surely, the range of free expression would be meaningfully reduced if prominent persons in the present and recent past were forbidden topics for the imaginations of authors of fiction.[12]

The facts of the present case are strikingly illustrative. Valentino was a Hollywood star. His life and career are part of the cultural history of an era. As the title of respondents' film suggests, Valentino became a

[11]See *Middlebrooks v. Curtis Publishing Co.* (4th Cir. 1969) 413 F.2d 141. Cf. *Leopold v. Levin* (1970) 45 Ill.2d 434 [259 N. E.2d 250] (fictional book, play and motion picture based on Leopold-Loeb case); *Wojtowicz v. Delacorte Press* (1977) 58 App.Div.2d 45 [395 N.Y.S.2d 205], affirmed 43 N.Y.2d 858 [403 N.Y.S.2d 218, 374 N.E.2d 129] (fictional motion picture *Dog Day Afternoon* based on real incident.)

[12]For example, Garry Trudeau, creator of the satiric cartoon strip "Doonesbury," regularly fictionalizes events and dialogue involving prominent political figures. It cannot be seriously maintained that one such satirized notable could successfully pursue an action for an infringement on his right of publicity based on such use.

"legend," a symbol of the romantic screen idol and lover. His lingering persona is an apt topic for poetry or song, biography or fiction.[13] Whether respondents' work constitutes a serious appraisal of Valentino's stature or mere fantasy is a judgment left to the reader or viewer, not the courts.[14]

The third strand in appellant's argument is that the incorporation of a prominent person's identity in a fictional work poses a threat to the value of his right of publicity not found in truthful accounts. Yet truthful accounts, no less than fictional ones, may trade upon the publicity value in Valentino's identity and thereby diminish its value. The author of an unauthorized truthful publication may be inspired by, and seek to profit from, the public's interest in Valentino's career or legend. The truthful account may sate the public's desire for "contact" with Valentino, making any other plan for exploitation or revelation a profitless venture. Conversely, the false report, no less than the truthful, may stimulate interest and infuse great value in the previously insignificant publicity value in a celebrity's identity. A fictional account is as likely to laud as to denigrate. It may either augment or diminish the value of a celebrity's right of publicity. Therefore, any assertion that fictional accounts pose a unique threat to the right of publicity not found in truthful reports is simply not justified.[15] (See Treece, *Commercial Exploitation of Names, Likenesses, and Personal Histories* (1973) 51 Texas L.Rev. 637, 660.)

Finally, appellant claims that the film is not entitled to constitutional protection because respondents acted with "knowledge or reckless disregard of the falsity" of their broadcast concerning Valentino. However,

---

[13]Amicus curiae informs the court that, in addition to the film at issue, at least five biographies and three motion pictures concerning Valentino have been produced.

[14]"Whether [works of fiction] are creations of merit, whether they have value only as entertainment and no value whatever as opinion, information or education, pose questions which would require us to stake out those elusive lines ..." inconsistent with the constitutional protections accorded expression. "It is fundamental that courts may not muffle expression by passing judgment on its skill or clumsiness, its sensitivity or coarseness; nor on whether it pains or pleases. It is enough that the work is a form of expression 'deserving of substantial freedom—both as entertainment and as a form of social and literary criticism' [citation] ...." (*University of Notre Dame* v. *Twentieth Century-Fox, supra,* 256 N.Y.S.2d at p. 307. Accord *Cohen* v. *California, supra,* 403 U.S. at p. 25 [29 L.Ed.2d at pp. 293-294].)

[15]False or fictional accounts may pose a unique danger to the subject's reputation. However, appellant has expressly disavowed any intention of pursuing a claim that respondents' film defamed Valentino.

appellant's effort to import the "actual malice" standard of liability in defamation actions of *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412] is misguided.

That standard reflects the Supreme Court's recognition that while defamatory false statements of fact have no constitutional value,[16] such statements are inevitable in the continuing debate on public issues. Accordingly, to provide adequate protection to "speech that matters," the court held that even false statements of fact concerning public figures and officials are not actionable unless they are published with knowledge of their falsity or reckless disregard for the truth. (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at pp. 339-343 [41 L.Ed.2d at pp. 805-807]; *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at pp. 706-707].)

No such constitutional dichotomy exists in this area between truthful and fictional accounts. They have equal constitutional stature and each is as likely to fulfill the objectives underlying the constitutional guarantees of free expression. (See, *ante,* pp. 865-868.) Moreover, in defamation cases, the concern is with defamatory lies masquerading as truth. In contrast, the author who denotes his work as fiction proclaims his literary license and indifference to "the facts." There is no pretense. All fiction, by definition, eschews an obligation to be faithful to historical truth. Every fiction writer knows his creation is in some sense "false." That is the nature of the art. Therefore, where fiction is the medium—as alleged by appellant in this case and as evident in the film's title, *A Romantic Fiction*—it is meaningless to charge that the author "knew" his work was false.

Clearly, appellant's basis for distinguishing respondents' film from other expressive works, whether factual or fictional, is unpersuasive. Appellant has not established any analytic framework which logically differentiates respondents' film from other expressions. Hence, an action for infringement of the right of publicity can be maintained only if the proprietary interests at issue clearly outweigh the value of free expression in this context.

While few courts have addressed the question of the parameters of the right of publicity in the context of expressive activities, their re-

---

[16]*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at page 340 [41 L.Ed.2d at page 805]. But see *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at page 279, footnote 19 [11 L.Ed.2d at page 706].

sponse has been consistent. Whether the publication involved was factual and biographical[17] or fictional,[18] the right of publicity has not been held to outweigh the value of free expression. Any other conclusion would allow reports and commentaries on the thoughts and conduct of public and prominent persons to be subject to censorship under the guise of preventing the dissipation of the publicity value of a person's identity. Moreover, the creation of historical novels and other works inspired by actual events and people would be off limits to the fictional author. An important avenue of self-expression would be blocked and the marketplace of ideas would be diminished. As one commentator recently observed, "it is difficult to imagine anything more unsuitable, or more vulnerable under the First Amendment, than compulsory payment, under a theory of appropriation, for the use made of [an individual's identity in a work of fiction]." (fn. omitted.) (Hill, *supra,* 76 Colum.L.Rev. at p. 1305.)

A cause of action for the appropriation of Valentino's right of publicity through the use of his name and likeness in respondents' film may not be maintained. The trial court properly sustained the demurrer and dismissed the complaint.[19]

A similar result is compelled for the use of Valentino's name and likeness in advertisements for the film. That use was merely an adjunct to the exhibition of the film. It was not alleged that the advertisements

---

[17]See, e.g., *Frosch* v. *Grossett & Dunlap, Inc.* (N.Y.Sup.Ct. Jan. 9, 1979) 4 Med.L. Rep. 2307; *Factors Etc., Inc.* v. *Creative Card Co.* (S.D.N.Y. 1977) 444 F.Supp. 279,284; *Rosemont Enterprises, Inc.* v. *Random House, Inc.* (1968) 58 Misc.2d 1 [294 N.Y.S.2d 122, 129], affirmed 32 App.Div.2d 892 [301 N.Y.S.2d 948]. Cf. *Current Audio, Inc.* v. *RCA Corporation* (1972) 71 Misc.2d 831 [337 N.Y.S.2d 949, 954]; *Paulsen* v. *Personality Posters, Inc.* (1968) 59 Misc.2d 444 [299 N.Y.S.2d 501, 508-509]. See generally, Nimmer, *The Right of Publicity* (1954) 19 Law & Contemp. Prob. 203, 216-217.

[18]See, e.g., *Hicks* v. *Casablanca Records* (S.D.N.Y. 1978) 464 F.Supp. 426, 433; *Rosemont Enterprises, Inc.* v. *McGraw-Hill Book* (1975) 85 Misc.2d 583 [380 N.Y.S.2d 839, 844]; *Donahue* v. *Warner Bros. Pictures Distributing Corp.* ((1954) 2 Utah 2d 256 [272 P.2d 177, 183]. See generally, Hill, *supra.,* 76 Colum.L.Rev. at pages 1304-1306.

[19]The use of a person's name or likeness in a fictional work may constitute an invasion of privacy or defamation. (See *Cordell* v. *Detective Publications, Inc.* (E.D.Tenn. 1968) 307 F.Supp. 1212, 1217-1218, affd. (6th Cir. 1969) 419 F.2d 989; Hill, *supra,* 76 Colum.L.Rev. at pp. 1304-1306. Cf. *Middlebrooks* v. *Curtis Publishing Company, supra,* 413 F.2d 141.) Appellant did not seek recovery under either theory.

promoted anything but the film. Having established that any interest in financial gain in producing the film did not affect the constitutional stature of respondents' undertaking, it is of no moment that the advertisements may have increased the profitability of the film. It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise. Since the use of Valentino's name and likeness in the film was not an actionable infringement of Valentino's right of publicity, the use of his identity in advertisements for the film is similarly not actionable. (Cf. *Leopold* v. *Levin, supra,* 259 N.E.2d at p. 256; *Koussevitzky* v. *Allen, Towne & Heath* (1947) 188 Misc. 479 [68 N.Y.S.2d 779, 784], affd. 272 App.Div. 759 [69 N.Y.S.2d 432].)

The refusal to permit a cause of action based on the right of publicity for the use of a deceased celebrity's identity in a film is consistent with the result in two analogous cases. In *Donahue* v. *Warner Bros. Pictures Distributing Corp., supra,* 272 P.2d 177, plaintiffs were the widow and daughters of Jack Donahue, a famous singer, dancer and comedian in the first part of this century. Plaintiffs brought suit based on the portrayal of Jack Donahue's life in a motion picture. The suit was grounded on a statute which prohibited the use of any person's name or likeness "for purposes of trade." The court recognized the serious constitutional problems inherent in permitting such an action to be maintained, and it regarded a proffered distinction "between educational and informative as compared with fictional publications" to be "unsatisfactory." (*Id.,* at p. 182.) In light of the "important interest to be served in free and uninhibited expression in all channels of public information, of which the movies are an effective medium," the Utah Supreme Court held that whether the film was factual or fictional, no action could be maintained for the use of Donahue's identity in the film. (*Id.,* at p. 183.)

In *Hicks* v. *Casablanca Records, supra,* 464 F.Supp. 426, the heir and assignees of the late Agatha Christie, mystery writer extraordinaire, brought suit to enjoin the distribution of the book and motion picture *Agatha,* which presented a fictionalized account of an incident in Agatha Christie's life. The action was based on an infringement of Mrs. Christie's common law right of publicity, which had been transferred to plaintiffs. (*Id.,* at pp. 429-430.) Although the works in issue were found to be fictional and not biographical, the court recognized that the movie and book enjoyed constitutional protections not accorded general commercial merchandise. (*Id.,* at pp. 430-431.) Finding the

speech interests paramount, the court held "the right of publicity does not attach ... where a fictionalized account of an event in the life of a public figure is depicted in a novel or a movie, and in such novel or movie it is evident to the public that the events so depicted are fictitious." (*Id.,* at p. 433.) Defendants' motions to dismiss the complaint were granted. (Accord *Rosemont Enterprises, Inc.* v. *McGraw-Hill Book, supra,* 85 Misc.2d 583 [380 N.Y.S.2d 839].)[20]

In contrast, the facts underlying *Lugosi* v. *Universal Pictures, supra, ante,* page 813 are substantially different than those in the present case. *Lugosi* involved the use of Bela Lugosi's likeness in connection with the sale of such commercial products "as plastic toy pencil sharpeners, soap products, target games, candy dispensers and beverage stirring rods." (*Id.,* at p. 851 (dis. opn.).) These objects, unlike motion pictures, are not vehicles through which ideas and opinions are regularly disseminated.[21] (See *Hicks* v. *Casablanca Records, supra,* 464 F.Supp. at

[20]Appellant relies on certain New York cases which hold that the use of an individual's name in connection with a work which is substantially fictionalized is actionable. (See, e.g., *Binns* v. *Vitagraph Co.* (1913) 210 N.Y. 51 [103 N.E. 1108]; *Spahn* v. *Julian Messner, Inc.* (1967) 21 N.Y.2d 124 [286 N.Y.S.2d 832, 233 N.E.2d 840], app. dism. 393 U.S. 1046 [21 L.Ed.2d 600, 89 S.Ct. 676]; *Koussevitzky* v. *Allen, Towne & Heath, supra,* 188 Misc. 479 [68 N.Y.S.2d 779], affd. 272 App.Div. 759 [69 N.Y.S.2d 432].) These decisions are inapplicable to the issue raised in the present case. Those actions were commenced under a statute which specifically prohibited the use of a *living* person's name or picture "for the purposes of trade." Unlike the common law right of publicity, the "statutory right is deemed a 'right of privacy' and is based upon the classic right of privacy's theoretical basis, which is to prevent injury to feelings. (*Lombardo* v. *Doyle, Dane & Bernbach, Inc., supra,* 396 N.Y.S.2d at p. 664. Accord *Price* v. *Hal Roach Studios, Inc.* (S.D.N.Y. 1975) 400 F.Supp. 836, 843.) Hence, the feelings of the living person portrayed in a challenged fictional work would appear to be of paramount concern. The harm inflicted would be akin to the injury alleged in a "false light" privacy or defamation case. (See *Time, Inc.* v. *Hill, supra,* 385 U.S. at p. 384, fn. 9 [17 L.Ed.2d at p. 465].) This interest is distinct from the economic interest underlying the right of publicity. Indeed, the inapplicability of New York's law to this jurisdiction has already been noted. (*Stryker* v. *Republic Pictures Corp.* (1951) 108 Cal.App.2d 191, 196 [238 P.2d 670]. Cf. *Gill* v. *Curtis Publishing Co., supra,* 38 Cal.App.2d at p. 281.) Finally, I disagree with those decisions to the extent they suggest the fictionalization of a portion of an individual's life is actionable in the absence of any invasion of privacy or defamation. I find the interest in free expression paramount and overrides a plaintiff's ability to control the publicity values in his name. (See *Hill, supra,* 76 Colum. L.Rev. at pp. 1304-1306; *Treece, supra,* 51 TexasL.Rev. at pp. 655-660. Cf. *Carlisle* v. *Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 748 [20 Cal.Rptr. 405].)

[21]This is not to suggest that the incorporation of a prominent person's name or likeness in a commercial product could never be considered an expression entitled to constitutional protection. (See Smith & Sobel, *The Mickey Mouse Watch Goes to Washington: Would the Law Stop the Clock?* (1972) 62 Trademark Rep. 334. But see *Rosemont Enterprises, Inc.* v. *Urban Systems, Inc.* (1973) 72 Misc.2d 788 [340 N.Y.S.2d 144], affd. as mod. 42 App.Div.2d 544 [345 N.Y.S.2d 17]; *Rosemont Enterprises* v. *Choppy Productions* (1972) 74 Misc.2d 1003 [347 N.Y.S.2d 83]. Compare

p. 430.) This case involves the use of a celebrity's identity in a constitutionally protected medium of expression, a work of fiction on film. *Lugosi* simply did not address the viability of a cause of action for appropriation of the right of publicity under these circumstances.

Finally, *Zacchini* v. *Scripps-Howard Broadcasting Co., supra,* 433 U.S. 562, does not require that appellant be accorded protection. In *Zacchini,* respondent filmed petitioner's "entire act" in a human cannonball performance and broadcast his performance on television. (*Id.,* at p. 564 [53 L.Ed.2d at p. 969].) Under state law, petitioner had the "right to the publicity value of his performance," the right to control its commercial display and exploitation. (*Id.,* at p. 565 [53 L.Ed.2d at p. 970].) The Supreme Court found that the broadcast went "to the heart of petitioner's ability to earn a living as an entertainer" and posed a "substantial threat to the economic value of [petitioner's] performance." (*Id.,* at pp. 575-576 [53 L.Ed.2d at pp. 975-977].) In light of the nature of this interest, the court held that a suit for damages based on respondent's broadcast of petitioner's "entire act" was not precluded by the First Amendment. (*Id.,* at pp. 574-575 [53 L.Ed.2d at pp. 975-976[].)[22]

In the present case, respondents did not surreptitiously film a performance by Valentino and incorporate that film in a motion picture. They did not appropriate "an entire act for which the performer ordinarily gets paid," thereby undercutting his ability to earn a living. (*Id.,* at p. 574 [53 L.Ed.2d at p. 975].) Rather, respondents produced a fictional film about the legend of Valentino. Respondents' conduct was thus much more akin to commenting upon or reporting the facts of Zacchini's performance, which the Supreme Court regarded as entirely permissible. (*Id.,* at pp. 569, 574 [53 L.Ed.2d at p. 975].) Further, in balancing the interests at stake, the Supreme Court observed that respondents had not merely made some use of Zacchini's name and likeness, but had usurped Zacchini's entire act. The court suggested that the latter is entitled to greater protection. (*Id.,* at p. 573, fn. 10 [53

Comment, *Privacy, Appropriation, and the First Amendment: A Human Cannonball's Rather Rough Landing* (1977) B.Y.U.L.Rev. 579, 595-596, and Note, *The Right of Publicity—Protection For Public Figures and Celebrities* (1976) 42 Brooklyn L.Rev. 527, 550-556 with Treece, *supra,* 51 Texas L.Rev. at pp. 665-668.)

[22]The court noted that permitting petitioner to maintain an action would not diminish the dissemination of information, as petitioner only sought compensation for the broadcast. (*Id.,* at pp. 573-574 [53 L.Ed.2d at pp. 974-975].) In this case, appellant asked the trial court to enjoin exhibition of respondents' film.

L.Ed.2d at p. 974].) Finally, the Supreme Court recognized each state's authority to prescribe the contours of its right of publicity. (*Id.,* at pp. 578-579 [53 L.Ed.2d at p. 978].) In this opinion, I do no more than accept the Supreme Court's invitation to define one boundary of this state's common law right of publicity.

Tobriner, J., and Manuel, J., concurred.

NEWMAN, J.—▮ I concur in the court's opinion. Further, I concur in the discussion in the Chief Justice's opinion that sets forth principles for determining whether an action based on the invasion of an individual's right of publicity may be maintained in the face of a claim that the challenged use is an exercise of freedom of expression. While the Chief Justice applies those principles under the facts of this case to a suit by the heir of a prominent person, it seems clear that the principles similarly would apply to a suit brought by that person.