**CHER, Plaintiff-Appellee,**

v.

**FORUM INTERNATIONAL, LTD., a New York corporation, dba Forum Magazine; Penthouse International, Ltd., a New York corporation; News Group Publications, Inc., a Delaware corporation, dba the Star; Fred Robbins, an individual, Defendants-Appellants.**

Nos. 82–5105, 82–5106, 82–5107.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 3, 1982.

Decided Nov. 18, 1982.

N. Roy Grutman, New York City, argued for Forum Intern., Ltd. and Fred Robbins; Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., on brief.

Louis P. Petrich, Los Angeles, Cal., argued for Penthouse Intern., Ltd.; Young-man, Hungate & Leopold, Los Angeles, Cal., on brief.

John D. Forbess, Rudin, Perlstein & Chieffo, Beverly Hills, Cal., for Cher.

Lawrence W. Dam, Lillick McHose & Charles, Los Angeles, Cal., Howard M. Squadron, Squadron, Ellenoff, Plesent & Lehrer, New York City, Lillick, McHose & Charles, Los Angeles, Cal., for News Group Publications, Inc.

Appeal from the United States District Court for the Central District of California.

Before CHAMBERS and GOODWIN, Circuit Judges, EAST,* District Judge.

GOODWIN, Circuit Judge.

A well-known entertainer who performs under the name "Cher" sued a number of defendants for damages allegedly arising out of the unauthorized publication in two magazines of portions of an interview that she had given to a writer for a third, which did not use it. A court trial resulted in judgment for compensatory and punitive damages against all defendants. They appeal.

This controversy began when Fred Robbins taped an hour-and-a-half interview with Cher in Atlantic City. Robbins is a radio talk show host who interviews celebrities and sells the interviews, or parts of them, to as many magazines as possible. Robbins and Cher understood that the taped interview was to be published in *Us* magazine. Cher and her agents were apparently interested in having a cover story in that magazine, timed to reach the public about the same time Cher expected to release a new album.

The editors of *Us* magazine, at Cher's request, did not run the interview, and returned it to Robbins, paying him a "kill" fee. Cher apparently did not feel that the interview sufficiently emphasized her new band. Robbins sold the interview to two of the defendants, the publishers of a tabloid called *Star,* and the publishers of a pocket-sized magazine called *Forum.*

---

* The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

Cher does not allege that the published text of the interview was false or defamatory. Nor does she contend that private facts were published without her consent. Instead her complaint charged breach of contract, unfair competition, misappropriation of name and likeness, misappropriation of right to publicity, and violations of the Lanham Act,[1] all with reference to the publishers' use of headlines, cover promotions and advertising in connection with the interview.

■ The trial court found for Cher and awarded general and punitive damages against all defendants. The court indulged in the regrettable practice of asking the winning lawyers to draw the findings of fact; so we do not know what the trial court would have said in its own words. We therefore give the findings special scrutiny. *United States v. State of Washington,* 641 F.2d 1368, 1371 (9th Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982); *Photo Electronics Corp. v. England,* 581 F.2d 772, 777 (9th Cir.1978). After examining the record, we conclude that the evidence does not support the findings in their entirety, and the law does not support parts of the judgment.

### (1) Fred Robbins

■ Robbins taped the interview with Cher with her consent and cooperation. She now says she gave that consent under the mistaken belief that the interview would appear as a cover story in *Us* magazine and that she did not consent to other uses of the interview. The trial court found that Cher had no contract with Robbins. We accept that finding. Moreover, it was stipulated that Robbins had never promised any interviewee approval rights over an interview. Accordingly, any liability of Robbins to Cher must be predicated upon a finding that Robbins participated in one or more of the tortious actions of the publisher defendants.

Robbins had no part in the publishing, advertising or marketing of the articles in question. Accordingly, the judgment against Robbins is clearly erroneous and must be vacated.[2]

### (2) News Group Publications, Inc.

News Group Publications, Inc. publishes, among other things, a tabloid called *Star. Star* published portions of the Robbins interview in its March 17 and 24, 1981, issues and printed Cher's picture and these words on its March 17 cover: "Exclusive Series", followed by "Cher: My life, my husbands and my many, many men."

Cher's theory against News Group was that her image as a major celebrity was degraded by the suggestion that she would give an exclusive interview to that publication. Cher also claimed that News Group had wrongfully appropriated Cher's implied endorsement of *Star* for commercial purposes.

■ We note first that it was stipulated that "exclusive" interviews with Cher had previously appeared in *Star* a number of times. We also note that Cher conceded at trial that she had never been paid for an interview, and that *Star* had never paid an interviewee for an interview. Whether the article itself was an "exclusive," it was stipulated that the *Star* article had not previously appeared in any other publication. Even if some of the material in *Star* had already appeared in *Forum,* Cher did not suffer any damage from *Star's* exaggerated claims of exclusivity.

■ *Star* bought an interview with a public figure from a free-lance writer and published portions of it. This activity is protected by the First and Fourteenth Amendments in the absence of a showing that the publishers knew that their statements were false or published them in reckless disregard of the truth. *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d

---

1. We decide the case on grounds other than the Lanham Act and therefore express no opinion on its applicability to these facts.

2. Robbins also asserts that the court lacked personal jurisdiction over him. It is not necessary for us to address this argument in view of our disposition on the merits.

456 (1967). Cher makes no claim that *Star* published any statements from the interview with knowledge that they were false or with reckless disregard for their truth.

■ Cher's theory was that by using the words "Exclusive Series" and "Cher: My life, my husbands and my many, many men" on the cover of *Star,* the magazine was falsely representing to the public that Cher had given *Star* an exclusive interview.

*Star* was entitled to inform its readers that the issue contained an article about Cher, that the article was based on an interview with Cher herself, and that the article had not previously appeared elsewhere. It sought to do so by the use of words, including "Exclusive Series." The use of these words cannot support a finding of the knowing or reckless falsity required under *Time, Inc. v. Hill.*

Neither do the words in question constitute a false claim that Cher endorsed *Star* magazine. There is no evidence in the record to support such a theory. The district court in effect imposed liability on the basis of earlier negotiations between Cher and News Group relating to a contract for commercial advertising and Cher's endorsement of *Star,* to be aired on television. These negotiations were never concluded, and were not relevant in this case, where no endorsement was in fact shown.

The California statute governing the use of another's name or likeness for commercial purposes contains an express exception for news accounts. Cal.Civ.Code § 3344(d).

The California Supreme Court has subjected the "right of publicity" under California law to a narrowing interpretation which accords with First Amendment values. The Court has acknowledged that "the right of publicity has not been held to outweigh the value of free expression. Any other conclusion would allow reports and commentaries on the thoughts and conduct of public and prominent persons to be subject to censorship under the guise of preventing the dissipation of the publicity value of a person's identity." *Guglielmi v. Spelling-Goldberg Productions,* 25 Cal.3d 860, 873, 160 Cal.Rptr. 352, 359–360, 603 P.2d 454, 461–462 (1979) (Bird, J. concurring.) Cher has no claim based on *Star's* publication and exploitation of her interview with Robbins.

The judgment against News Group is reversed.

(3) Forum International, Ltd.

Forum International, Ltd., a New York corporation, published part of the Robbins interview in the March 1981 issue of *Forum,* identifying Robbins as the interviewer but changing the text so that *Forum* appeared as the poser of questions and Cher appeared as the respondent (apparently a common practice in the industry). The magazine printed Cher's picture on its cover with the words: "Exclusive: Cher Talks Straight." *Forum* also caused to be published advertising copy referring to Cher which is discussed below. Cher sued Forum International on two theories: (1) falsely creating and exploiting the impression that Cher had in fact given an exclusive interview directly to *Forum* when she had not; and (2) exploiting Cher's celebrity value to sell magazines without her consent by implying that she endorsed *Forum.*

■ Cher concedes that *Forum's* publication of the interview was protected by the First Amendment. As explained above with reference to News Group, this protection extends to *Forum's* use of headlines and cover display so long as the headlines and promotional devices were true or were not published with knowledge that they were false or in reckless disregard for their truth. It was stipulated that the photos used by *Forum* were purchased from an independent agency which owned them. Unlike *Star,* however, *Forum* also engaged in explicit advertising using Cher's name and picture. This advertising provided an alternate basis for liability.

*Forum* carried inside its March 1981 issue a subscription "tear out" opposite the following legend: "There are certain things that Cher won't tell People and would never tell Us. She tells Forum." This message was printed above a picture of Cher. The text of the ad included the following sen-

tence: "So join Cher and FORUM's hundreds of thousands of other adventurous readers today."

The same legend and picture were used in an ad appearing in the February 1981 issue of *Penthouse.* The text of that ad included the sentence: "So take a tip from Cher and hundreds of thousands of other adventurous people and subscribe to Forum."

*Forum* was also the beneficiary of a display advertisement in the *New York Daily News* on February 18, 1981, which, next to her picture, stated: "Cher Never Told Anyone How She Played Kiss and Tell with Rock Star Gene Simmons ... She Told Forum Magazine." The court found that both Forum International and Penthouse International participated in concocting and placing the above described advertising copy and concluded that they were liable for falsely implying that Cher had endorsed *Forum.*

■ California law permits recovery for the unauthorized use of one's likeness or name for commercial purposes. *Guglielmi, supra; Lugosi v. Universal Pictures,* 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 (1979); *Fairfield v. American Photocopy Equipment Co.,* 138 Cal.App.2d 82, 291 P.2d 194 (1955); Cal.Civ.Code § 3344. No action under this theory will lie, however, solely for publication which is protected by the First Amendment.

■ Constitutional protection extends to the truthful use of a public figure's name and likeness in advertising which is merely an adjunct of the protected publication and promotes only the protected publication. *Guglielmi,* 160 Cal.Rptr. at 360, 603 P.2d at 462. Advertising to promote a news medium, accordingly, is not actionable under an appropriation of publicity theory so long as the advertising does not falsely claim that the public figure endorses that news medium. *Namath v. Sports Illustrated,* 48 A.D.2d 487, 371 N.Y.S.2d 10 (1975), *affirmed,* 39 N.Y.2d 897, 386 N.Y.S.2d 397, 352 N.E.2d 584 (1976), (no violation of right to publicity where magazine uses picture of celebrity who had previously appeared in

magazine in subscription advertisement with heading "How to get Close to Joe Namath"). *Forum* would have been entitled to use Cher's picture and to refer to her truthfully in subscription advertising for the purpose of indicating the content of the publication, *Guglielmi, supra,* because such usage is protected by the First Amendment. But *Forum* was not content with honest exploitation of the fact that it possessed some pictures of Cher and an interview that she had given a writer. *Forum* falsely proclaimed to the readers of its advertising copy that Cher "tells *Forum*" things that she "would never tell *Us.*" In view of the fact that Cher had intended to "tell" the rival magazine, *Us,* the very words in the interview, and had not "told" *Forum* anything, the advertising copy was patently false. This kind of mendacity is not protected by the First Amendment, and those defendants responsible for the placement and circulation of the challenged advertising copy must look elsewhere for their protection.

■ The trial court found in effect that *Forum* or *Penthouse* published the ads in question with knowledge that they were false or in reckless disregard for their truth. Cher maintains that *Forum* falsely stated that Cher had actually endorsed that magazine. *Forum* contends that the statements which form the basis of Cher's complaint are vague and subject to numerous interpretations. For example, "So join Cher and FORUM's hundreds of thousands of other adventurous readers today" may readily be interpreted in several ways. The reader may understand this as an invitation to enjoy reading about Cher along with other readers or to read about Cher and other readers in *Forum,* which as a regular feature prints a large number of letters from readers. Similarly, "so take a tip from Cher..." is equivocal and could be interpreted to refer to what the reader will learn from reading about Cher in *Forum* magazine. Cher's own expert admitted that the other language in the ads—*e.g.,* "There are certain things that Cher won't tell People and would never tell Us. She tells Forum" —does not constitute an express endorse-

ment. Nevertheless, the trier found that there was an implied endorsement of *Forum* in the words of the advertisement.

Because of the First Amendment implications in this case, we have examined the trier's findings with the extra care required in such cases. We are satisfied that the trier could find, from the record as a whole, that no matter how carefully the editorial staff of *Forum* may have trod the border between the actionable and the protected, the advertising staff engaged in the kind of knowing falsity that strips away the protection of the First Amendment. Whether we agree with the trier's finding of knowing falsity, or fall back a step to reckless disregard for the truth, there is enough evidence to support the material findings under Fed. R.Civ.P. 52 against Forum International, Ltd.

### (4) Penthouse International, Ltd.

██ Cher's theory against Penthouse International was based on two aspects of Penthouse International's involvement with Forum International: (1) Penthouse International owns 80% of the stock of Forum International; and (2) *Penthouse*'s staff participated in the preparation of the advertisements which appeared in *Forum* and in *Penthouse*. For the same reasons that we sustain the trier's material findings against Forum International, we sustain the findings against Penthouse International. There was enough participation in the false advertising to permit Penthouse International to share Forum International's liability.

The remaining questions have to do with the measure of damages.

The challenged judgment provides that Cher:

(1) recover of defendants Forum International, Ltd., Penthouse International, Ltd., and Fred Robbins, jointly and severally, as special damages, the sum of $100,000, with interest;

(2) recover of defendants Forum International, Ltd. and Fred Robbins, jointly and severally, as general damages, the additional sum of $69,117, with interest;

(3) recover of defendant Forum International, Ltd., as exemplary damages, the additional sum of $100,000, with interest;

(4) recover of defendants News Group Publications, Inc. and Fred Robbins, jointly and severally, as special and general damages, the additional sum of $169,117, with interest;

(5) recover of defendant News Group Publications, Inc., as exemplary damages, the additional sum of $200,000, with interest;

(6) recover of defendant Fred Robbins, as exemplary damages, the additional sum of $25,000, with interest; together with costs against all defendants jointly and severally.

Because Fred Robbins did not participate in the activities found by the trial court to be wrongful, all portions of the judgment against Robbins are vacated.

██ We find no substantial flaw in the manner in which the trier found general and special damages against Penthouse International and Forum International. Accordingly, those parts of items (1) and (2) which impose general and special damages against Penthouse International and Forum International, with interest from January 15, 1982, at seven percent, are affirmed.

Some exemplary damages can be supported as punishment for the false advertising and promotional misrepresentations of those defendants. In view of the dollar amounts that were discussed in the evidence concerning situations when celebrities agree to commercialize their publicity value, we cannot say that the trier's assessment of $100,000 exemplary damages in item (3) against Forum is clearly erroneous.

All portions of the judgment against News Group Publications, Inc., are vacated.

Reversed in part, affirmed in part, and modified in part.