**MEMPHIS DEVELOPMENT FOUNDATION,**
**Plaintiff-Appellant,**

v.

**FACTORS ETC., INC.,**
**Defendant-Appellee.**

No. 79–1270.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 31, 1979.

Decided March 6, 1980.

Rehearing and Rehearing En Banc Denied April 28, 1980.

David J. Cocke, Ronald S. Borod, Rosenfield, Borod, Bogatin & Kremer, Memphis, Tenn., for plaintiff-appellant.

Kenneth R. Masterson, John J. Thomason, W. Frank Crawford, Thomason, Crawford & Hendrix, Memphis, Tenn., Daniel H. Lidman, Beverly Hills, Cal., for defendant-appellee.

Before WEICK and MERRITT, Circuit Judges, and CECIL, Senior Circuit Judge.

MERRITT, Circuit Judge.

This appeal raises the interesting question: Who is the heir of fame? The famous have an exclusive legal right during life to control and profit from the commercial use of their name and personality. We are called upon in this diversity case to determine whether, under Tennessee law, the exclusive right to publicity survives a celebrity's death. We hold that the right is not inheritable. After death the opportunity for gain shifts to the public domain, where it is equally open to all.

### I.

Elvis Presley died in Memphis on August 16, 1977. To honor him, the Memphis Development Foundation, a Tennessee non-profit corporation, laid plans to erect a large bronze statue of Presley in downtown Memphis. The Foundation solicited public contributions to pay for the sculpture. Donors of $25 or more received an eight-inch pewter replica of the proposed statue from the Foundation.

The District Court held that the heirs and assigns of Presley retained his exclusive right of publicity after his death. It held that the exclusive right to exploit Elvis Presley's name and likeness currently belongs to Factors Etc., Inc., the assignee of Elvis Presley's "right of publicity." The District Court thus enjoined further distribution of the replicas by the Foundation.

Prior to his death, Presley had conveyed the exclusive right to exploit the commercial value of his name and likeness to Boxcar Enterprises in exchange for royalties. Colonel Tom Parker, Presley's manager, was the majority shareholder of Boxcar. Parker owned 56% of the shares; Presley and Tom Dishkin, President of Boxcar, each owned 22%. Two days after Presley's death, Boxcar sold a license to use its rights to Factors for $150,000. Presley's father agreed to the sale on behalf of Elvis' estate.

The Foundation instituted this action seeking a declaratory judgment that Factors' license does not preclude distribution by the Foundation of the pewter replicas and that the Foundation has the right to erect the Presley statue.

Factors in turn by counterclaim seeks damages and an injunction against further distribution of the replicas by the Foundation. Factors claims that the Foundation is selling the statuettes for $25 apiece, and thus appropriating Factors' exclusive right to reap commercial value from the name and likeness of Elvis Presley.

The District Court issued an injunction against the Foundation. The injunction allows the Foundation to build the Presley memorial but prohibits it from manufacturing, selling or distributing any statuette bearing the image or likeness of Elvis Presley, or utilizing commercially in any manner or form the name, image, photograph or likeness of Elvis Presley.

### II.

At common law, there is a right of action for the appropriation or unauthorized com-

mercial use of the name or likeness of another. An individual is entitled to control the commercial use of these personal attributes during life.[1] But the common law has not heretofore widely recognized this right to control commercial publicity as a property right which may be inherited. *See* W. Prosser, Handbook of The Law of Torts § 117, at 804, 815 (4th ed. 1971).

Recently, a few cases have characterized the right of publicity as property which may be passed on to heirs or assigns.[2] In addition, a recent law journal article advocates recognition of such a right after death where a person has exploited his fame during life by assigning it to an agent or otherwise entering into a contract for its use. The theory is that the law should recognize that "the possibility of providing for one's heirs may have a motivational effect during one's life." Assignment during life is the touchstone because "if no contract has been created, the identification of . . . harm is . . . difficult" and evidently "such concerns were not a substantial motivation." The article thus distinguishes between "the unrealized *potential* ability of a person to profit from his attributes," an interest insufficient to establish an inheritable right, and the conscious exploitation of the right during life, the continuation of which after death fulfills "the social policy of encouraging individual creativity." Felcher & Rubin, *Privacy, Publicity, and the Portrayal of Real People by the Media*, 88 Yale L.J. 1577, 1618–19 (1979).

Tennessee courts have not addressed this issue directly or indirectly, and we have no way to assess their predisposition. Since the case is one of first impression, we are left to review the question in the light of practical and policy considerations, the treatment of other similar rights in our legal system, the relative weight of the conflicting interests of the parties, and certain moral presuppositions concerning death, privacy, inheritability and economic opportunity. These considerations lead us to conclude that the right of publicity should not be given the status of a devisable right, even where as here a person exploits the right by contract during life.

## III.

Recognition of a post-mortem right of publicity would vindicate two possible interests: the encouragement of effort and creativity, and the hopes and expectations of the decedent and those with whom he contracts that they are creating a valuable capital asset. Although fame and stardom may be ends in themselves, they are normally by-products of one's activities and personal attributes, as well as luck and promotion. The basic motivations are the desire to achieve success or excellence in a chosen field, the desire to contribute to the happiness or improvement of one's fellows and the desire to receive the psychic and financial rewards of achievement. As John Rawls has written, such needs come from the deep psychological fact that the individuals want the respect and good will of other persons and "enjoy the exercise of their realized capacities (their innate or trained abilities), and this enjoyment increases the more the capacity is realized, or the greater

1. Courts have recognized that the right of publicity exists independently of the right of privacy. *See, e. g., Ettore v. Philco Television Broadcasting Corp.*, 229 F.2d 481 (3d Cir.), *cert. denied*, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956); *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953); Nimmer, *The Right of Publicity*, 19 Law & Contemp. Prob. 203 (1959).

2. *E. g., Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 221–22 (2d Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979) (Elvis Presley's right of publicity sur- vived his death because exploited contractually during his life); *Hicks v. Casablanca Records & Filmworks*, 464 F.Supp. 426, 429–30 (S.D.N.Y. 1978) (Agatha Christie's right of publicity was devisable because exploited during her life); *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836, 844 (S.D.N.Y.1975) ("no logical reason" to terminate exclusiveness of Laurel and Hardy's right of publicity upon death); Note, *The Right of Publicity—Protection for Public Figures and Celebrities*, 42 Brooklyn L.Rev. 527, 541–49 (1976); Comment, *Transfer of the Right of Publicity: Dracula's Progeny and Privacy's Stepchild*, 22 U.C.L.A.L.Rev. 1103 (1975).

its complexity." (Footnote omitted.) According to Rawls:

> [Such] activities are more enjoyable because they satisfy the desire for variety and novelty of experience, and leave room for feats of ingenuity and invention. They also evoke the pleasures of anticipation and surprise, and often the overall form of the activity, its structural development, is fascinating and beautiful. *A Theory of Justice* 426–27 (1971).

Fame is an incident of the strong motivations that Rawls describes. The desire to exploit fame for the commercial advantage of one's heirs is by contrast a weak principle of motivation. It seems apparent that making the right of publicity inheritable would not significantly inspire the creative endeavors of individuals in our society.

### IV.

On the other hand, there are strong reasons for declining to recognize the inheritability of the right. A whole set of practical problems of judicial line-drawing would arise should the courts recognize such an inheritable right. How long would the "property" interest last? In perpetuity? For a term of years? Is the right of publicity taxable? At what point does the right collide with the right of free expression guaranteed by the first amendment? Does the right apply to elected officials and military heroes whose fame was gained on the public payroll, as well as to movie stars, singers and athletes? Does the right cover posters or engraved likenesses of, for example, Farah Fawcett Majors or Mahatma Gandhi, kitchen utensils ("Revere Ware"), insurance ("John Hancock"), electric utilities ("Edison"), a football stadium ("RFK"), a pastry ("Napoleon"), or the innumerable urban subdivisions and apartment complexes named after famous people? Our legal system normally does not pass on to heirs other similar personal attributes even though the attributes may be shared during life by others or have some commercial value. Titles, offices and reputation are not inheritable. Neither are trust or distrust and friendship or enmity descendible. An employment contract during life does not create the right for heirs to take over the job. Fame falls in the same category as reputation; it is an attribute from which others may benefit but may not own.

■ The law of defamation, designed to protect against the destruction of reputation including the loss of earning capacity associated with it, provides an analogy. There is no right of action for defamation after death. *See* Restatement (Second) of Torts § 560 (rev. ed. 1977). The two interests that support the inheritability of the right of publicity, namely, the "effort and creativity" and the "hopes and expectations" of the decedent, would also support an action for libel or slander for destruction of name and reputation after death. Neither of these reasons, however, is sufficient to overcome the common law policy terminating the action for defamation upon death.

Fame often is fortuitous and fleeting. It always depends on the participation of the public in the creation of an image. It usually depends on the communication of information about the famous person by the media. The intangible and shifting nature of fame and celebrity status, the presence of widespread public and press participation in its creation, the unusual psychic rewards and income that often flow from it during life and the fact that it may be created by bad as well as good conduct combine to create serious reservations about making fame the permanent right of a few individuals to the exclusion of the general public. Heretofore, the law has always thought that leaving a good name to one's children is sufficient reward in itself for the individual, whether famous or not. Commercialization of this virtue after death in the hands of heirs is contrary to our legal tradition and somehow seems contrary to the moral presuppositions of our culture.

There is no indication that changing the traditional common law rule against allowing heirs the exclusive control of the commercial use of their ancestor's name will increase the efficiency or productivity of our economic system. It does not seem

reasonable to expect that such a change would enlarge the stock or quality of the goods, services, artistic creativity, information, invention or entertainment available. Nor will it enhance the fairness of our political and economic system. It seems fairer and more efficient for the commercial, aesthetic, and political use of the name, memory and image of the famous to be open to all rather than to be monopolized by a few. An equal distribution of the opportunity to use the name of the dead seems preferable. The memory, name and pictures of famous individuals should be regarded as a common asset to be shared, an economic opportunity available in the free market system.

These same considerations also apply to the Presley assigns' more narrow argument based on the fact that Presley entered into contracts during his life for the commercial use of his image. It is true that the assignment of the right of publicity during life shows that Presley was aware of the value of the asset and intended to use it. The assignment also suggests that he intended to convert a mere opportunity or potential for profit into a tangible possession and consciously worked to create the asset with, perhaps, the hope of devising it.

The question is whether the specific identification and use of the opportunity during life is sufficient to convert it into an inheritable property right after death. We do not think that whatever minimal benefit to society may result from the added motivation and extra creativity supposedly encouraged by allowing a person to pass on his fame for the commercial use of his heirs or assigns outweighs the considerations discussed above.

Accordingly, the judgment of the District Court is reversed and the case is remanded for further proceedings consistent with the principles announced above.