GROUCHO MARX PRODUCTIONS, INC. and Susan Marx, as Trustee under the Last Will and Testament of Harpo Marx, Plaintiffs,

v.

DAY AND NIGHT COMPANY, INC., Alexander Cohen and the Shubert Organization, Defendants.

DAY AND NIGHT COMPANY and Alexander Cohen, Third-Party Plaintiffs,

v.

Richard K. VOSBURGH and Frank Lazarus, Third-Party Defendants.

No. 80 Civ. 2310 (WCC).

United States District Court,
S. D. New York.

Oct. 2, 1981.

Parcher & Herbert, P. C., New York City, for plaintiffs; Peter A. Herbert, Stewart L. Levy, New York City, of counsel.

Pryor, Cashman, Sherman & Flynn, New York City, for defendants; John Fernbach, James A. Janowitz, New York City, of counsel.

Midgal, Tenney, Glass & Pollack, New York City, for third-party defendants; Lawrence W. Pollack, Daniel Glass, George E. Regis, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This action arises out of the production of the musical play, "A Day in Hollywood/A Night In the Ukraine" by defendants, Day and Night Company, Inc., Alexander Cohen and the Shubert Organization. (Plaintiffs' claims against the Shubert Organization have now been otherwise resolved). Plaintiffs, Groucho Marx Productions, Inc. and Susan Marx, as Trustee under the will of Harpo Marx, claim, *inter alia,* that defendants have appropriated their rights of publicity in the names and likenesses of Groucho, Harpo and Chico Marx. In their amended complaint plaintiffs also allege causes of action under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for misappropriation of proprietary rights, for interference with contractual relations, and for infringement of common law copyright and unfair competition. In turn, defendants have asserted third-party claims against Richard K. Vosburgh and Frank Lazarus, authors of the play. None of the parties has demanded a jury trial.

Presently before the Court are cross-motions for summary judgment. Plaintiffs seek summary judgment based on their right-of-publicity claim. Defendants and third-party defendants (hereinafter referred to as "defendants") have cross-moved for summary judgment on all of plaintiffs' causes of action.

*Background*

Plaintiffs acquired what rights, if any, they have in the Marx Brothers characters in three ways. Plaintiff Susan Marx claims standing as trustee of the residuary trust under the last will and testament of Adolph ("Harpo") Marx.

Plaintiff Marx Productions claims its rights through contractual assignments. On October 2, 1976, Julius ("Groucho") Marx assigned to plaintiff all right, title and interest in the name, likeness and style of the character Groucho, both as an individual and as a member of the Marx Brothers. Subsequently, on June 13, 1979, Marx Productions executed a similar agreement with the estate of Leo ("Chico") Marx by his widow, Mary Marx Fusco. The will of Leo Marx does not expressly devise any intangible rights; Mary Marx Fusco claimed these rights as the residuary beneficiary of the will.

Plaintiffs assert that these rights have been infringed by the play, which originally opened in the New End Theatre in London, England on January 10, 1979. The play made several other stops before opening on Broadway on May 1, 1980. Plaintiffs take issue with the second half of the play which features performers simulating the unique appearance, style and mannerisms of the Marx Brothers.

*Summary Judgment*

The claims for summary judgment based on the right of publicity will be considered first. For summary judgment to issue, there must be no questions of material fact and the prevailing party must be entitled to judgment as a matter of law. Rule 56, F.R.Civ.P.; *SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978). In resolving the right of publicity claim several legal issues present themselves: (1) whether New York recognizes a common law right of publicity;[1] (2) if so, whether such a right is descendible; and (3) whether the first amendment protection of entertainment limits the scope of the right of publicity as applied in this case.

A. *The Right of Publicity in New York*

Despite burgeoning activity in this area,[2] New York courts have never explicitly recognized a non-statutory right of publicity. See *Brinkley v. Casablancas*, 80 A.D.2d 428, 438 N.Y.S.2d 1004 (1st Dept. 1981) (citing *Wojtowicz v. Delacorte Press*, 43 N.Y.2d 858, 403 N.Y.S.2d 218, 219, 374 N.E.2d 129 (1978). The right of publicity, as defined by other courts, represents the right of an individual to control the commercial value of his name and likeness and to prevent their unauthorized exploitation by others. See *Estate of Elvis Presley v. Russen*, 513 F.Supp. 1339, 1353 (D.N.J.1981). Although the right of publicity developed as an offshoot of the law of privacy,[3] the right differs in that it protects the plaintiff's commercial interests rather than non-economic interests such as freedom from public embarrassment or scorn.

New York does provide statutory protection against the invasion of privacy of living persons. See N.Y.Civil Rights Law §§ 50 and 51. This statutory right is neither descendible, see *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768, 427 N.Y.S.2d 828, 828 (1st Dept. 1980), nor assignable, see *Rosemont Enterprises, Inc. v. Random House, Inc.*, 58 Misc.2d 1, 294 N.Y.S.2d 122, 129 (N.Y.Co.1968), aff'd, 32 A.D.2d 892, 301 N.Y.S.2d 948 (1st Dept. 1969), and applies only to limited situations.[4] Because the present case involves the publicity rights of deceased celebrities, such rights, if they exist, must stem from the common law.

Although no state court has ruled on the issue, several federal courts, including the Second Circuit, have concluded that a right of publicity does exist in New York.[5]

---

1. Preliminarily there seems to be some confusion among the parties as to which state's law governs this claim. It appears to the Court that New York law is operative here as the law of the place of the wrong. *Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 405 N.Y.S.2d 441, 376 N.E.2d 914 (Ct.App.1978), or as the place with the most significant contacts, *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (Ct.App.1963). All defendants are New York residents, the play has run here longer than in any other place and the Marx Brothers characters were originally developed and perfected in New York.

2. The right of publicity has been the subject of intense scrutiny by courts and commentators alike. See, *e. g., Memphis Development Foundation v. Factors*, 616 F.2d 956 (6th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980); *Factors Etc., Inc. v. Pro Arts Inc.*, 579 F.2d 215 (2d Cir. 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Lugosi v. Universal Pictures*, 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 (1979) (*en banc*); Felcher & Rubin, The Descendibility of the Right of Publicity: Is There Commercial Life After Death?, 89 Yale L.J. 1125 (1980); Note, The Right of Publicity—Protection for Public Figures and Celebrities, 42 Brooklyn L.Rev. 527 (1976). The phrase "right of publicity" was used first by the Second Circuit in *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir.), *cert. denied,* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953).

3. W. Prosser, Law of Torts, 804 (4th ed. 1971).

4. In *Lombardo v. Doyle, Dane & Bernbach, Inc.*, 58 A.D.2d 620, 396 N.Y.S.2d 661 (2d Dept. 1977), the court noted *in dictum* that

"... while a cause of action under the Civil Rights Law is not assignable during one's lifetime and terminates at death, the right to publicity, *i. e.,* the property right in one's name, photograph and image is under no such inhibition."
*Id.* 396 N.Y.S.2d at 664.

5. Section 51 provides in relevant part:

"[A]ny person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in

See *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 220–21 (2d Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836, 844 (S.D.N.Y.1977).

The Second Circuit first considered whether a claim for the commercial infringement of one's likeness is cognizable outside of the privacy statute in *Haelan Laboratories v. Topps Chewing Gum, Inc.*, 202 F.2d 866, *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953). In *Haelan* the question was whether a contract signed by a ballplayer for the exclusive right to use his photo constituted a release of liability under the privacy statute or an assignment of a property right in his likeness. *Id.* at 867. The court held that the contract was a valid assignment of the right to market the ballplayer's likeness and stated:

> "[w]e think that, in addition to and independent of that right of privacy (which in New York derives from statute), a man has a right in the publicity value of his photograph, ....
>
> "This right might be called a 'right of publicity.' For it is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other

advertiser from using their pictures." *Id.* at 868.

The right, having been distinguished from a right personal to the individual, is capable of being transferred by him for commercial purposes. *Id.*

Following *Haelan*, other cases decided in this district have recognized a right of publicity under New York law. See *Hicks v. Casablanca Records*, 464 F.Supp. 426 (S.D.N.Y.1977); *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836 (S.D.N.Y.1975). Moreover, in *Factors Etc., Inc. v. Pro Arts*, 579 F.2d 215 (2d Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979), the Second Circuit, assuming at the time the applicability of New York law, reaffirmed its conclusion that New York recognizes a right of publicity as a transferable interest. *Id.* at 221.[6]

Given the Second Circuit's clearly stated opinion on this issue, this Court need only examine state cases decided after *Factors* in order to determine whether there is any new indication that those courts disagree with the federal interpretation of New York law.

In two cases decided after *Factors*, the First Department has discussed, but not decided, the issue of the existence of a common law right of publicity. In *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768, 427 N.Y.S.2d 828 (1st Dept. 1980) (mem.), the court considered claims by Marilyn Monroe's estate that a fictional biography published after Ms. Monroe's death infringed her rights of privacy and publicity. The

the supreme court of this state against the person, firm, or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use ...."

**6.** In a subsequent appeal in the *Factors* case the Second Circuit, upon determining that Tennessee law applied, held that there was no descendible right of publicity. *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 at 283 (2d Cir. 1981). This holding was premised on the conclusion that, under the circumstances, one court of appeals should defer to another circuit as to the law of a state within that circuit. *Id.*

Thus the Second Circuit adhered to the interpretation of Tennessee law in a recent Sixth Circuit opinion, *Memphis Development Foundation v. Factors Etc., Inc.*, 616 F.2d 956 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980). The more recent *Factors* decision does not appear to alter the Second Circuit's position on the state of the law in New York. See *Factors* at 282 (writer would probably uphold descendible right of publicity were he serving on Tennessee Supreme Court); *id.* at 287 (Mansfield, J., dissenting) (where publicity right exploited by individual during lifetime, right should be devisable or descendible at death).

court rejected the privacy claim because the Civil Rights Law applies only to "any living person." As to the right of publicity claim, the court, instead of disposing of it as part of the statutory claim, dismissed on the separate ground that, even if the estate possessed such rights, first amendment considerations would prevail and would preclude a finding of liability. *Id.* 427 N.Y. S.2d at 829.

The First Department again had occasion to discuss the right of publicity in *Brinkley v. Casablancas*, 80 A.D.2d 428, 438 N.Y.S.2d 1004 (1st Dept., 1981). *Brinkley* involved a suit by a model to enjoin the sale of an unauthorized poster bearing her likeness and to recover damages under the privacy statute. The defendants claimed that the plaintiff's damages were of a commercial nature and thus her claim was not within the ambit of Section 51. The court held that the statutory right of privacy embraces a public figure's commercial interest in the exploitation of his personality. Although the court noted the state and federal cases discussing an independent, nonstatutory right of publicity, it decided that those cases were inapposite where the statute covered the activity complained of. The court concluded that "irrespective of whether a separate and distinct common law right of publicity exists" in New York, the privacy statute provides monetary relief for the invasion of commercial value in one's likeness. The decision, therefore, cannot be read as casting doubt on the New York courts' willingness to recognize the commercial value in a name and likeness. Accordingly, this Court finds, in line with other courts in this Circuit, that a suit for infringement of publicity is cognizable under New York law.

B. *The Descendibility of the Right*

■ In deciding whether the right of publicity survives death this Court again finds guidance in prior decisions of the Second Circuit. In *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979), the Second Circuit, assuming the governance of New York law, considered whether the right of publicity survived Elvis Presley's death. During Presley's lifetime the commercial rights to his likeness were marketed through Boxcar Enterprises, a corporation controlled by Presley and his manager. *Id.* at 217. Two days after Presley's death, these rights were assigned to Factors. The court held that the assigned right of publicity survived Presley's death, reasoning that

"[t]he death of Presley, who was merely the beneficiary of an income interest in Boxcar's exclusive right, should not in itself extinguish Boxcar's property right. Instead, the income interest, continually produced from Boxcar's exclusive right of commercial exploitation, should inure to Presley's estate at death like any other intangible property right. To hold that the right did not survive Presley's death, would be to grant competitors of Factors, such as Pro Arts, a windfall in the form of profits from the use of Presley's name and likeness. At the same time, the exclusive right purchased by Factors and the financial benefits accruing to the celebrity's heirs would be rendered virtually worthless." *Id.* at 221.

In reaching its decision in *Factors*, the Second Circuit analyzed another case from this district, *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836 (S.D.N.Y.1975). In *Price* the court applied New York law in determining whether the right to exploit the names and likenesses of Laurel and Hardy survived their deaths. The plaintiff corporation had been assigned the pair's commercial rights by Stan Laurel (during his lifetime), by Oliver Hardy's widow (who claimed her rights as Hardy's sole heir) and by Laurel and Hardy Productions. After the death of both Laurel and Hardy, the plaintiff sued to protect against infringement of its rights by the defendants. The court found that, unlike the situation obtaining with respect to the right of privacy, there is "no logical reason" to terminate the publicity right upon the death of the person protected.

"Since the theoretical basis for the classic right of privacy, and of the statutory

right in New York, is to prevent injury to feelings, death is a logical conclusion to any such claim. In addition, based upon the same theoretical foundation, such a right of privacy is not assignable during life. When determining the scope of the right of publicity, however, one must take into account the purely commercial nature of the protected right. Courts and commentators have done just that in recognizing the right of publicity as assignable. There appears to be no logical reason to terminate this right upon death of the person protected. It is for this reason, presumably, that this publicity right has been deemed a 'property right.' " *Id.* at 844 (footnotes omitted).

In *Factors,* the Second Circuit ruled that the right survived Presley's death because it had been exploited during his lifetime.[7] Although the *Factors* court did not define "exploitation," the term has been interpreted to mean that

"a party claiming the right must establish that the decedent acted in such a way as to evidence his or her own recognition of the extrinsic commercial value of his or her name or likeness, and manifested that recognition in some overt manner, *e. g.,* making an *inter vivos* transfer of the rights in the name (*Factors*), or posing for bubble gum cards (see *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866 (2d Cir.), *cert. denied,* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953))." *Hicks v. Casablanca Records,* 464 F.Supp. 426, 429 (S.D.N.Y.1978).

In the present case, defendants assert that the Marx Brothers did not exploit their rights of publicity during their lifetimes. Defendants contend that exploitation means commercial use other than the celebrity's main commercial activity. Thus, defendants argue, the inquiry should be directed not to the Marx Brothers' activities as stage, movie, television or night club performers, but to their activities, if any, in product endorsements and the like.

In support of this argument, defendants rely on a case decided by the California Supreme Court, *Lugosi v. Universal Pictures,* 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 (1979) (*en banc*). In *Lugosi* the widow and surviving son of actor Bela Lugosi, who played the title role in the 1930 film *Dracula,* brought suit to recover profits made by the defendant movie company in its licensing of the "Count Dracula" character. The *Lugosi* court broadly held that the right to exploit one's name and likeness is personal and must be exercised, if at all, during the owner's lifetime. 160 Cal.Rptr. at 329, 603 P.2d at 431. The court stated, however, that

"Lugosi could have created during his lifetime through the commercial exploitation of his name, face and/or likeness in connection with the operation of any kind of business or the sale of any kind of product or service a general acceptance and good will for such business, product or service among the public, the effect of which would have been to impress such business, product or service with a secondary meaning, protectable under the law of unfair competition. (*Johnston v. 20th Century-Fox Film Corp.* (1947) 82 Cal.App.2d 796, 810, 187 P.2d 474). The tie-up of one's name, face and/or likeness with a business, product or service creates a tangible and saleable product in much the same way as property may be created by one who organizes under his name a business to build and/or sell houses according to a fixed plan or who writes a book, paints a picture or creates an invention." *Id.* 160 Cal.Rptr. at 326, 603 P.2d at 428 (footnote omitted).

Thus defendants urge that exploitation of the right of publicity requires commercial "tie-up" activities. This standard would require theatrical performers to seek tie-ups merely to preserve the descendibility of their right to control the commercial value of their stage personae. Moreover, the standard suggested by defendants appears to exceed that intended by at least one

---

**7.** The Second Circuit left open the question of whether the right would survive the death of the celebrity if not exploited during the celebrity's life. 579 F.2d at 222 n.11.

member of the *Lugosi* majority. Justice Mosk clarified his understanding of the majority opinion in his own concurring opinion as follows:

"I do not suggest that an actor can never retain a proprietary interest in a characterization. An original creation of a fictional figure played exclusively by its creator may well be protectible. Thus Groucho Marx just being Groucho Marx, with his moustache, cigar, slouch and leer, cannot be exploited by others. Red Skelton's variety of self-devised roles would appear to be protectible, as would the unique personal creations of Abbott and Costello, Laurel and Hardy and others of that genre. Indeed the court in a case brought by the heirs of Stanley Laurel and Oliver Hardy (*Price v. Hal Roach Studios, Inc.* (S.D.N.Y.1975) 400 F.Supp. 836) observed at page 845: 'we deal here with actors portraying themselves and developing their own characters....'" *Id.* 160 Cal.Rptr. at 330, 603 P.2d at 432 (Mosk, J., concurring) (citation omitted).

■ Defendants also rely on *Martin Luther King Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.*, 508 F.Supp. 854 (N.D.Ga.1981). In *King*, the court considered, *inter alia*, a claim by Dr. King's estate that the sale by the defendant of plastic busts of the deceased civil rights leader infringed the estate's right of publicity. The district court ruled that the right did not descend to Dr. King's estate because Dr. King had not exploited the right during his lifetime.

"The commercial exploitation that would be required in this case to permit his heirs to enjoin any and all reproductions of Dr. King's image by third parties requires, we believe, a showing of at least some intent on Dr. King's part to capitalize on the commercial value of his name and likeness. Unlike many celebrities, Dr. King did not exploit his public personality to his commercial advantage by endorsing products or selling merchandise bearing his name or image. It was not his purpose in accepting honorariums for speeches, permitting the use of his photo-graphs, or selling the rights to his speeches to establish his personality as a commercial commodity ...." *Id.* at 865.

In my opinion, *King* cannot be read to support the proposition that commercial tie-ups outside the celebrity's major activity are necessary to exploit one's right of publicity. Rather, the court indicated that there must be some showing of actions by the celebrity that demonstrate an intent to capitalize on the commercial value of his name and likeness.

■ Turning to the resolution of the exploitation issue in the present case, there is little question that Julius Marx demonstrated a recognition of and the intent to capitalize on the value of the name and likeness of the character Groucho. Julius Marx made an *inter vivos* transfer of his rights, an action similar to that taken by Elvis Presley. See *Factors*, 579 F.2d at 217. Moreover, Julius Marx also included a testamentary disposition of his rights in his will.

Neither Leo nor Adolph Marx made any *inter vivos* or specific testamentary disposition of their rights. This fact does not end the inquiry, however, since other acts taken by the two comedians may manifest the requisite intent to exploit the commercial value in the names and likenesses of Chico and Harpo Marx.

As a common sense matter, it must be noted that Leo and Adolph Marx, no less than Julius, earned their livelihoods by exploiting the unique characters they created. Unlike Dr. King, whose celebrity status arose from his civil rights work, the Marx Brothers' fame arose as a direct result of their efforts to develop instantly recognizable and popular stage characters, having no relation to their real personalities. Here, unlike the *King* case, there can be no question of intent to capitalize on the commercial value of artificial personalities created for entertainment purposes. Every appearance, contract and advertisement involving the Marx Brothers signified recognition by the performers of the commercial value of unique characters they portrayed. To suggest, as defendants do, that the right of publicity was not exploited because the

Marx Brothers did not endorse dance studios, candy bars or tee shirts is wholly illogical.

For the foregoing reasons, this Court finds that the Marx Brothers exploited their rights of publicity in their self-created characters and therefore those rights are properly asserted here.[8]

### C. First Amendment considerations

Defendants contend that the first amendment protects dramatic performances of literary works and therefore plaintiffs' claim of infringement of the right of publicity must fail. Unquestionably, first amendment interests must be considered in defining the scope of the right; the balance between the two has been analyzed in various cases. See, *e. g., Zacchini v. Scripps Howard Broadcasting Co.,* 433 U.S. 562, 569–79, 97 S.Ct. 2849, 2854–59, 53 L.Ed.2d 965 (1977); *Factors Etc., Inc. v. Pro Arts, Inc., supra,* 579 F.2d at 222. Although "entertainment . . . enjoys First Amendment protection," *Zacchini,* 433 U.S. at 578, 97 S.Ct. at 2859, the purpose or function of such entertainment must be scrutinized in determining the scope of the right of publicity. See *Estate of Elvis Presley v. Russen,* 513 F.Supp. 1339, 1356–57 (D.N.J.1981). Felcher & Rubin, *Privacy, Publicity and the Portrayal of Real People by the Media,* 88 Yale L.J. 1577, 1596 (1979).

As a general rule, if the defendants' works are designed primarily to promote the dissemination of thoughts, ideas or information through news or fictionalization, the right of publicity gives way to protected expression. See, *e. g., Frosch v. Grosset & Dunlap, Inc.,* 75 A.D.2d 768, 427 N.Y.S.2d 828 (1st Dept. 1980). If, however, the defendants' use of the celebrity's name or likeness is largely for commercial purposes, such as the sale of merchandise, the right of publicity prevails. See, *e. g., Estate of Elvis Presley v. Russen,* 513 F.Supp. at 1358.

Defendants contend that New York courts have indicated that great weight should be given to first amendment considerations in defining the right of publicity. They rely on *Frosch v. Grosset & Dunlap, Inc., supra,* in which the First Department considered a claim by the estate of Marilyn Monroe that a fictional biography violated the estate's right of publicity. Assuming, but not deciding, that such a descendible right exists, the court stated:

"Plaintiff disputes the characterization of the book as a biography. We think it does not matter whether the book is properly described as a biography, a fictional biography, or any other kind of literary work. It is not for a court to pass on literary categories, or literary judgment. It is enough that the book is a literary work and not simply a disguised commercial advertisement for the sale of goods or services. The protection of the right of free expression is so important that we should not extend any right of publicity, if such exists, to give rise to a cause of action against the publication of a literary work about a deceased person." 427 N.Y.S.2d at 829.

Clearly, the situation at issue here is not analogous to that litigated in *Frosch.* The present case does not involve publication of a book discussing the lives or careers of the Marx Brothers; the play constitutes an unauthorized appropriation of the Marx Brothers' characters by imitation of their act.

Nevertheless, *Frosch* does make clear that literary works, including fictionalizations, are entitled to protection. By analogy to copyright law and the fair use doc-

---

**8.** Defendants assert that the standing of Susan Marx presents an issue of fact for trial. They point out that Susan Marx is not named as testamentary trustee under Harpo Marx's will. In response, plaintiffs note that Alva Marx, a/k/a Susan Marx, in her capacity as widow of Adolph Marx was named trustee of the residuary trust under his will pursuant to the "Judgment Settling First and Final Account and Re- port of Executrix, and of Final Distribution Under Will" issued by the Superior Court of the State of California. Defendants offer no evidence to dispute this but merely assert that the description of Mrs. Marx in the final settlement raises an issue of fact for trial. The Court does not agree with the conclusion given the California court's disposition of Harpo Marx's will.

trine, parody, burlesque, satire and critical review might be immune from the right of publicity because of their contribution as entertainment and as a form of literary criticism. See *Estate of Elvis Presley v. Russen*, 513 F.Supp. at 1359 n.21. In contrast to an imitator, who usurps a work for commercial gain without contributing substantially to the work, a commentator, parodist or satirist makes use of another's attributes in order to create a larger presentation. See Nimmer on Copyright, §§ 13.05 [B], [C].[9]

Defendants contend that the play is a parody of the Marx Brothers' performance and cite reviews of the play terming it a "spoof," "compendium" and "parody." Defendants also rely on the affidavit of Richard Vosburgh, author of the play and a third-party defendant here, stating that his intention was to write a satiric comment on Hollywood movies using a parody of the Marx Brothers movies as one of the literary devices.

Applying the principles discussed above to the present case, I find as a matter of law that the defendants' production of the play is not protected expression. At the request of the parties, I reviewed the play in connection with an aborted motion for preliminary injunction. Although entertainment can merit first amendment protection, entertainment that merely imitates "even if skillfully and accurately carried out, does not really have its own creative component and does not have a significant value as pure entertainment." *Estate of Elvis Presley v. Russen*, 513 F.Supp. at 1359.

Although literary commentary may have been the intent of the playwright, any such intent was substantially overshadowed in the play itself by the wholesale appropriation of the Marx Brothers characters. Under the fair use doctrine in copyright law, a parodist is entitled to "conjure up" the original—a concept that allows the artist considerable leeway in building upon the original. See *Elsmere Music, Inc. v. National Broadcasting Co.*, 623 F.2d 252, 253 n.1 (2d Cir. 1980). Here, defendants have gone beyond merely building on the original to the point of duplicating as faithfully as possible the performances of the Marx Brothers, albeit in a new situation with original lines. The Marx Brothers themselves were a parody on life; the play does not present a parody on their parody but instead successfully reproduced the Marx Brothers' own style of humor. Although the playwright may have intended to comment "about 1930's Hollywood, its techniques, its stars and its excesses," Vosburgh Affidavit at 5, the content of the relevant portion of the play attempts to accomplish that objective exactly as would the Marx Brothers themselves.

This conclusion finds support in two cases dealing with appropriations of performers' acts. In *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), the Supreme Court considered whether the first amendment immunized from suit a television news show that had broadcast a performer's human cannonball act without his authorization. In concluding that the first amendment did not protect the defendant when it had appropriated the performer's "entire act" the Court noted:

> " '[t]he rationale for [protecting the right of publicity] is the straightforward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay.' Kalven, Privacy in Tort Law—Were Warren and Brandeis Wrong?, 31 Law & Contemp. Prob. 326, 331 (1966). Moreover, the broadcast of

9. In *Elsmere Music, Inc. v. National Broadcasting Co.*, 623 F.2d 252 (2d Cir. 1980), the Second Circuit explained the relationship between the parody and the original.

"A parody is entitled to 'conjure up' the original. Even more extensive use would still be fair use, provided the parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary."
623 F.2d at 253 n.1.

petitioner's entire performance, unlike the unauthorized use of another's name for purposes of trade or the incidental use of a name or picture by the press, goes to the heart of petitioner's ability to earn a living as an entertainer. Thus, in this case, Ohio has recognized what may be the strongest case for a 'right of publicity'—involving, not the appropriation of an entertainer's reputation to enhance the attractiveness of a commercial product, but the appropriation of the very activity by which the entertainer acquired his reputation in the first place." *Id.* at 576., 97 S.Ct. at 2857.[10]

In *Estate of Elvis Presley v. Russen, supra,* the court gave careful consideration to whether the defendant's production of "The Big El Show" was protected expressive activity in a suit for infringement of the right of publicity. The show starred an individual who closely resembled Presley and who imitated the appearance, dress and performing style of the deceased artist. The court found that, despite an informational and entertainment element, the show was predominantly designed to exploit Presley's likeness without otherwise contributing anything of substantial value to society. 513 F.Supp. at 1359. Analyzing the informational value of the show the court noted that "in comparison to a biographical film or play of Elvis Presley or a production tracing the role of Elvis Presley in the development of rock 'n roll, the information about Presley which 'The Big El Show' provides is of limited value." *Id.* at 1360.

■ In this case, like the *Presley* case, the defendants have not rebroadcast Marx Brothers acts but have reproduced their manner of performances by imitating their

style and appearance. The play at issue is not biographical nor can it be viewed as an attempt to convey information about the Marx Brothers themselves or about the development of their characters.

 For all the reasons stated, the Court finds that defendants' production of the play is not protected and has infringed the plaintiffs' rights of publicity in the Marx Brothers characters.[11]

The decision on defendants' cross-motion for summary judgment on plaintiffs' remaining causes of action is reserved pending a pretrial conference to be held on October 16, 1981 at 9:30 A.M., Room 608.

SO ORDERED.

**10.** In *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir. 1979) the court enjoined production of a television series that was to portray the comedy team of Laurel & Hardy. The first amendment issue was not addressed in the opinion.

**11.** Defendants argue that plaintiffs have abandoned their rights or are estopped from asserting them. Defendants state that others have imitated the comedians without licenses and

allege that plaintiffs delayed in objecting to the play. No support is offered for these arguments. Even assuming that abandonment and estoppel apply to the right of publicity, defendants have not pointed to any overt act demonstrating plaintiffs' intent to abandon nor have defendants shown facts indicating detrimental reliance on plaintiffs' alleged delay. *Cf. Lottie Joplin Trust v. Crown Publishers, Inc.,* 456 F.Supp. 531, 535 (S.D.N.Y.1977), *aff'd,* 592 F.2d 651 (2d Cir. 1978).