689 F.2d 317
 216 U.S.P.Q. 553, 8 Media L. Rep. 2201
 GROUCHO MARX PRODUCTIONS, INC., et al., Plaintiffs-Appellees,
v.
DAY AND NIGHT COMPANY, INC., et al., Defendants-Appellants.
DAY AND NIGHT COMPANY, INC., et al., Third-Party-Plaintiffs-Appellants,
v.
Richard K. VOSBURGH, et al., Third-Party-Defendants-Appellants.
 Nos. 1247, 1255, Dockets 82-7183, 82-7185.
 United States Court of Appeals,
Second Circuit.
 Argued June 17, 1982.
Decided Sept. 10, 1982.
 
 Lawrence W. Pollack, New York City (Edmund R. Rosenkrantz, George E. Regis, and Migdal, Tenney, Glass & Pollack, New York City, on the brief), for third-party defendants-appellants Vosburgh and Lazarus.
 James A. Janowitz, New York City (John R. Fernbach, Arthur F. Engoron, and Pryor, Cashman, Sherman & Flynn, New York City, on the brief), for defendants-appellants Day and Night Co., Inc. and Cohen.
 Peter A. Herbert, New York City (Stewart L. Levy, L. Peter Parcher, and Parcher & Herbert, P.C., New York City, on the brief), for plaintiffs-appellees.
 Irwin Karp, New York City, submitted a brief for The Authors League of America, Inc. and the Dramatists Guild, Inc., amici curiae.
 Before NEWMAN and PIERCE, Circuit Judges, and CANNELLA, Senior District Judge.*
 NEWMAN, Circuit Judge:
 
 
 1
 For the second time in just two years, exercise of the diversity jurisdiction requires us to determine whether state law protects a person's so-called right of publicity-the right to exploit the commercial value of his name, likeness, or attributes-after his death.[1] See Factors Etc., Inc. v. Pro Arts, Inc., 652 F.2d 278 (2d Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982), leave to file petition for rehearing granted, 652 F.2d 278 (2d Cir. 1982). In the present case the District Court for the Southern District of New York (William C. Conner, Judge) ruled that under New York law the right of publicity is descendible, and granted a motion for partial summary judgment in favor of the plaintiffs-appellees, who claim to own the rights of publicity to which three of the Marx Brothers, Groucho, Chico, and Harpo, were entitled during their lives. 523 F.Supp. 485 (S.D.N.Y. 1981). Because we conclude that the descendibility of the Marx Brothers' rights of publicity is governed by California law and that, under that State's law, such rights either do not survive death or at least do not entitle the plaintiffs to relief in this case, we reverse the District Court's ruling.
 
 
 2
 The subject matter of this litigation is the musical play "A Day in Hollywood/A Night in the Ukraine," which enjoyed a successful run on Broadway beginning in May, 1980. The play is described by its authors as a "satiric comment" on Hollywood in the 1930's. The second ("Ukraine") half of the play purports to be the way the Marx Brothers would have dramatized Chekhov's novel "The Bear." Though the names of the Marx Brothers are not used, the script calls for the three principal performers to reproduce the appearance and comedy style made memorable by Groucho, Chico, and Harpo. Plaintiffs-appellees are Groucho Marx Productions, Inc., ("GMP") and Susan Marx, Harpo's widow. Defendants-appellants are Day and Night Company, Inc. and Alexander Cohen, producers of the play; third-party defendants-appellants are Richard K. Vosburgh and Frank Lazarus, authors of the play.
 
 
 3
 The plaintiffs' amended complaint sought damages "in the nature of a license fee" because of the defendants' exhibition of the play allegedly in derogation of plaintiffs' "exclusive rights of publicity relating to the commercialization of the characters of Groucho, Chico and Harpo." Jurisdiction was predicated upon 28 U.S.C. §§ 1331(a), 1332(a)(2), 1338 (1976). Federal question jurisdiction was invoked, in addition to diversity jurisdiction, on the theory that plaintiffs have claims arising under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976). The claim based on a right of publicity, with which this appeal is concerned, appears to be grounded solely on diversity jurisdiction.
 
 
 4
 Plaintiffs moved for summary judgment on the issue of liability based on the alleged appropriation of their right of publicity in the names and likenesses of the Marx Brothers. After determining that under appropriate choice of law rules, New York law governed the substantive rights of the plaintiffs, the District Court ruled that New York recognizes a right of publicity and that such a right is assignable and descendible. Judge Conner also concluded that whatever exploitation of the right during a celebrity's life is necessary to render the right descendible is satisfied by his normal professional performing. The Marx Brothers' every performance, the Court ruled, was sufficient exploitation without the need for them to "endorse dance studios, candy bars or tee shirts," 523 F.Supp. at 492. Judge Conner then rejected the defendants' claim that the First Amendment protected their right to exhibit the play without paying damages to the plaintiffs. He reasoned that the play was neither biographical nor an attempt to convey information and that whatever literary merit it possessed was outweighed by its "wholesale appropriation of the Marx Brothers characters." Id. at 493. He therefore granted the plaintiffs' motion for partial summary judgment on the issue of liability and certified his ruling for interlocutory appeal, 28 U.S.C. § 1292(b) (1976), which this Court accepted.
 
 
 5
 We need not rule on the correctness of these interpretations of New York common law and federal constitutional law,[2] for in our opinion, the initial decision to look to the law of New York was incorrect. The District Court, while noting that there was "some confusion among the parties as to which state's law governs this claim," ruled that New York, as the forum state, would apply its own substantive law, either as the law of the place of the wrong, Cousins v. Instrument Flyers, Inc., 44 N.Y.2d 698, 376 N.E.2d 914, 405 N.Y.S.2d 441 (1978) (per curiam), or as the law of the place with the most significant contacts, Babcock v. Jackson, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963), since "(a)ll defendants are New York residents, the play has run here longer than in any other place and the Marx Brothers characters were originally developed and perfected in New York." 523 F.Supp. at 487 n. 1. However, as we recently ruled in Factors Etc., Inc. v. Pro Arts, Inc., supra, a New York court, considering a right of publicity case, would apply its property choice-of-law rules to select the state whose law determines whether a plaintiff has a protectable right of publicity. All members of the Factors panel agreed that a New York court would look to Tennessee law on that issue, since the celebrity in that case, Elvis Presley, had been domiciled in Tennessee, the corporation to which he had assigned his right of publicity was incorporated there, and the licensing agreement between that corporation and the plaintiff corporation had been executed there and provided that it would be construed in accordance with Tennessee law. 652 F.2d at 281.
 
 
 6
 Applying the same principles to this diversity case, we conclude that the law governing the existence of plaintiffs' rights is California law. The three Marx Brothers, with whom we are here concerned, were California residents at the times of their deaths. Plaintiff GMP is a California corporation. Nine months prior to his death Groucho executed in California a contract assigning to GMP his right of publicity. Chico and Harpo made no assignment of a publicity right during their lives. Chico's estate, 18 years after his death, executed a contract purporting to convey to GMP Chico's right of publicity; this contract provides that it is "made and entered in the State of California" and that it is to be governed by California law. Plaintiff Susan Marx is a California resident, purporting to assert Harpo's right of publicity as the trustee of the residuary trust under Harpo's will, which was probated in California. Though the conduct alleged to impair plaintiffs' rights occurred in New York, the existence of their rights must be determined under the law of California.
 
 
 7
 Two decisions of the California Supreme Court appear to establish that under the law of that State, an individual's right of publicity terminates at his death, Guglielmi v. Spelling-Goldberg Productions, 25 Cal.3d 860, 603 P.2d 454, 160 Cal.Rptr. 352 (1979) (per curiam), and Lugosi v. Universal Pictures, 25 Cal.3d 813, 603 P.2d 425, 160 Cal.Rptr. 323 (1979). Guglielmi was a suit by the alleged nephew of the actor Rudolph Valentino for damages and an injunction because of the televised showing of a fictionalized version of Valentino's life. The California Supreme Court affirmed dismissal of the nephew's suit in the following paragraph:
 
 
 8
 In Lugosi v. Universal Pictures, 160 Cal.Rptr. 323, 603 P.2d 425, we hold that the right of publicity protects against the unauthorized use of one's name, likeness or personality, but that the right is not descendible and expires upon the death of the person so protected. Lugosi controls the disposition of the present case and makes it unnecessary to discuss any further issues raised by the parties.
 
 
 9
 603 P.2d at 455, 160 Cal.Rptr. at 353. The unequivocal nature of that statement is surely a sufficient basis for this Court, exercising diversity jurisdiction, to be satisfied that plaintiffs in this case hold no rights that California would recognize after the deaths of the Marx Brothers. Nevertheless, we explore the issue further because the Lugosi decision, on which Guglielmi relies, is at least open to the interpretation that its holding is narrow and therefore it is arguable that the broadly stated rule of Guglielmi should also be understood to have a narrower meaning than first appears.
 
 
 10
 Lugosi, decided two days prior to Guglielmi, was a suit by the heirs of the actor Bela Lugosi against the motion picture company that had produced several films based on the character Count Dracula. The best known of these films was the 1930 version in which Lugosi starred. In contracting to play the part, Lugosi gave the film studio rights to use his name and likeness to advertise the movie. After his death, his heirs sued the studio for the profits it had made in licensing "the use of the Count Dracula character to commercial firms" for merchandising products other than the film. 603 P.2d at 427, 160 Cal.Rptr. at 325. The trial court ruled in favor of the heirs, finding that the studio had appropriated the right Lugosi had in his facial characteristics and the individual manner of his likeness and appearance as Count Dracula. The California Court of Appeals reversed in an opinion adopted, with minor amendment, by the California Supreme Court.
 
 
 11
 Though the case presented the novel issue of whether a celebrity had a right of publicity in his appearance in a part already well known before he portrayed it, the California Supreme Court focused much of its attention on whether Lugosi had exploited his right of publicity during his lifetime. Acknowledging that Lugosi had exploited his right to a limited extent by contracting with Universal Pictures to use his likeness to promote the film, the Court nevertheless concluded that the heirs were claiming a descendible right of publicity for "commercial situations he left unexploited." 603 P.2d at 431, 160 Cal.Rptr. at 329. The Court noted that Lugosi had not availed himself of the opportunity it was willing to assume he had to exploit his name and likeness "in association with the Dracula character," suggesting that he might have "established a business under the name Lugosi Horror Pictures and sold licenses to have 'Lugosi as Dracula' imprinted on shirts," id. at 429, 160 Cal.Rptr. at 327 (footnote omitted). But since he did not, the Court considered it "rather novel to urge that ... the opportunity to have done so is property which descends to his heirs." Id. at 430, 160 Cal.Rptr. at 328 (emphasis in original). "We hold," the Court concluded, "that the right to exploit name and likeness is personal to the artist and must be exercised, if at all, by him during his lifetime." Id. at 431, 160 Cal.Rptr. at 329.
 
 
 12
 Without question, Lugosi established that California law does not recognize a descendible right of publicity available to the heirs of a celebrity who did not exploit his own right during his lifetime. What is less certain, however, is whether the right is descendible when the celebrity does exploit it during his lifetime. To take the California Court's example, what rights would Lugosi's heirs have had if he had established a company to market "Lugosi as Dracula" T-shirts?
 
 
 13
 There are three possible answers. If the broad rule stated in Guglielmi is taken literally, the heirs would have had no right of publicity that could prevent others from marketing Lugosi's likeness, even on T-shirts. Or they might have had a right of publicity that could prevent others from marketing his likeness on T-shirts, but not on any other product. Or they might have had a right of publicity that could prevent others from profiting in any way from the use of his likeness. It may well be that the broad rule that Guglielmi extracts from Lugosi is to be taken literally, at least by a diversity court trying to discern, not refine or evolve, state law. One passage of the Lugosi opinion, in particular, supports such a reading. The Court dwells on Dean Prosser's formulation that the right of publicity is one of four parts of an overall right of privacy, see 603 P.2d at 428, 160 Cal.Rptr. at 326 (quoting at length from Prosser, Privacy, 48 Calif.L.Rev. 383, 389 (1960)). Though noting that California law does not follow Prosser in thinking that a right of publicity is not assignable, the Court quotes with explicit approval Prosser's statement that " 'there is no common law right of action for a publication concerning one who is already dead.' " Id. at 429, 160 Cal.Rptr. at 327 (quoting Prosser, Law of Torts 815 (4th ed. 1971)) (emphasis in Court's opinion).[3]
 
 
 14
 If we did not follow the literal rule stated in Guglielmi, we could read Lugosi to permit the second, but not the third, of the three possible answers to our query as to what right of publicity Lugosi's heirs would have had if he had created the T-shirt business. At most, California would recognize a descendible right of publicity that would have enabled the heirs to prevent others from using Lugosi's name and likeness on T-shirts or any other product he had promoted during his life.[4] But we can be reasonably confident that California would not accept the third alternative, which would recognize a descendible right of publicity so broad as to enable the heirs to prevent any use of a celebrity's name and likeness so long as the celebrity exploited his right of publicity to promote at least one product or service during his lifetime. The California Supreme Court acknowledged that Lugosi had exploited his name and likeness to promote his Count Dracula film, but that did not entitle his heirs to assert a descendible right of publicity against use of Lugosi's name and likeness in connection with "commercial situations he left unexploited." 603 P.2d at 431, 160 Cal.Rptr. at 329. The Court's rationale on this point is revealed in an earlier passage, where it notes that Lugosi had not used his likeness as Dracula "in connection with any business, product or service so as to impress a secondary meaning on such business, product or service." Id. at 428, 160 Cal.Rptr. at 326 (emphasis added). This is the language of trademark law, under which the strength or public recognition of a mark as identifying the source of a particular product is significant in determining whether the proprietor may prevent use of the mark on similar products. See Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Perhaps Lugosi was relegating the heirs solely to their rights under trademark law. But even if it was recognizing a distinct descendible right of publicity, the right is limited to the particular "commercial situations"-products or services-that the celebrity promoted with his name and likeness during his lifetime.[5]
 
 
 15
 Lugosi also makes clear that playing a part is not the sort of exploitation of one's likeness or attributes that enables heirs to enjoy a descendible right of publicity. The California Supreme Court was willing to assume, for purposes of the Lugosi case, that Lugosi had an inchoate right of publicity to his appearance as Dracula-an opportunity to exploit the right in connection with one or more commercial products. Nevertheless, the Court rejected the heirs' suit. The Court was willing to find the requisite exploitation of this inchoate right only as to the film which Lugosi had agreed to promote with his name and likeness. Thus, applying California law, we must reject Judge Conner's view that the Marx Brothers, simply by performing as Groucho, Chico, and Harpo, exploited their rights of publicity so as to create descendible rights.[6]
 
 
 16
 We conclude that Lugosi is subject to two interpretations. It may mean that California does not recognize any descendible right of publicity and that the heirs of a celebrity must rely on trademark law to protect the good will that the celebrity brought to a product during his lifetime. Alternatively, Lugosi might mean that, wholly apart from trademark law, California recognizes a descendible right of publicity that enables the heirs to prevent the use of a celebrity's name and likeness on any product or service the celebrity promoted by exploiting his right of publicity during his lifetime. Under either of the two possible views of California law we have discerned, the plaintiffs in this litigation cannot prevail. Obviously, if no right of publicity survives death, the plaintiffs have no rights after the deaths of the Marx Brothers. Even if there is a limited descendible right, applicable to a product or service promoted by the celebrity, the defendants are not using the names or likenesses of the Marx Brothers in connection with any product or service that the comedians promoted during their lives.[7] Since California would recognize, at most, a descendible right of publicity only in connection with particular commercial situations-products and services-that a celebrity promoted during his lifetime, we conclude that California would not recognize a descendible right of publicity that protects against an original play using a celebrity's likeness and comedic style.[8]
 
 
 17
 For these reasons, we reverse the District Court's ruling granting partial summary judgment to the plaintiffs on the issue of liability for appropriation of a right of publicity and remand for the District Court's consideration of any issues that may remain.[9]
 
 
 
 *
 The Honorable John M. Cannella of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 See generally Felcher & Rubin, The Descendibility of the Right of Publicity: Is There Commercial Life After Death?, 89 Yale L.J. 1125 (1980)
 
 
 [2]
 We note, however, that any consideration of such questions would have to examine closely defendants' substantial argument that their play is protected expression as a literary work, especially in light of the broad scope permitted parody in First Amendment law. See Elsmere Music, Inc. v. National Broadcasting Co., 623 F.2d 252, 253 n. 1 (2d Cir. 1980)
 
 
 [3]
 Arguably also supporting a literal reading is the passage in which the Court endeavors to illustrate what benefits the heirs might have derived if Lugosi had organized or licensed the T-shirt company. The one example offered is the right to receive installment payments or royalties due after his death arising from a sale of his interest before his death. 603 P.2d at 429, 160 Cal.Rptr. at 327. Of course, contractual rights to receive accrued benefits are descendible. What is significant is that the Court does not even intimate the possibility that the heirs would receive royalties from T-shirt sales occurring after Lugosi's death. An available inference is that, even if the business had been created during his life, any exclusive rights of its proprietors protected by a right of publicity would have ended at Lugosi's death
 
 
 [4]
 This is a much narrower view than the one expressed by some courts that have upheld a descendible right of publicity assertable against any commercial use of a celebrity's name and likeness, so long as the celebrity made some commercial exploitation of his right during his life. See, e.g., Hicks v. Casablanca Records, 464 F.Supp. 426, 429 (S.D.N.Y. 1978) (to create a descendible right of publicity decedent must have "acted in such a way as to evidence his or her own recognition of the extrinsic commercial value of his or her name or likeness, and manifested that recognition in some overt manner, e.g., making an inter vivos transfer of the rights ..., or posing for bubble gum cards")
 
 
 [5]
 The Lugosi opinion comments in passing that an inter vivos assignment of the right would be "synonymous with its exercise." 603 P.2d at 431, 160 Cal.Rptr. at 329. However, the repeated emphasis elsewhere in the opinion of the need to create a "tie-up ... with a business, product or service," id. at 428, 160 Cal.Rptr. at 326, indicates that such an assignment would create a survivable interest only to the extent that the assigned right was transformed from a potential interest into a realized commercial interest by exploitation in connection with a particular commercial activity
 
 
 [6]
 Judge Conner drew support for his view from the following passage in Justice Mosk's concurring opinion in Lugosi: "An original creation of a fictional figure played exclusively by its creator may well be protectible. (Goldstein v. California, (1973) 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163) Thus, Groucho Marx just being Groucho Marx, with his moustache, cigar, slouch and leer, cannot be exploited by others." 603 P.2d at 432, 160 Cal.Rptr. at 330. We do not read this passage, or the balance of the concurrence, as altering our view that California recognizes either no descendible right of publicity or at most a descendible right to protect against use of a name and likeness in connection with a product or service for which the celebrity exploited his publicity right. Justice Mosk was disagreeing with the assumption, made by his colleagues, that Lugosi even had the opportunity while alive to exploit a right of publicity to his likeness as Dracula. Groucho, Justice Mosk suggests, would have had such an opportunity because of the originality of his distinctive character. But by joining the opinion of the Court, Justice Mosk must have been accepting the view that even if a person like Groucho had used his opportunity to exploit an original character, his heirs would have no more than a right in connection with the product he chose to promote, if, contrary to the pronouncement in Guglielmi, there is any descendible right at all
 
 
 [7]
 Plaintiffs-appellees allege that each of the Marx Brothers, during their lives, promoted various products, ranging from Plymouth automobiles to Smirnoff Vodka
 
 
 [8]
 In Guglielmi, the three members of the California Supreme Court who had dissented in Lugosi and who had favored a descendible right of publicity without a requirement of exploitation as to products or services, concurred in the Court's refusal to award damages for the televised exhibition of the fictionalized account of Valentino's life. Guglielmi v. Spelling-Goldberg Productions, supra, 603 P.2d at 455, 160 Cal.Rptr. at 353 (Bird, C.J., concurring, joined by Tobriner & Manuel, JJ.). Chief Justice Bird's concurring opinion, with which Justice Newman agreed, id. at 464, 160 Cal.Rptr. at 362, stated that the descendible right of publicity she would recognize would not entitle its holder to any protection against "expressive works," id. at 461, 160 Cal.Rptr. 359, a view that she described as "defin(ing) one boundary of this state's common law right of publicity." Id. at 464, 160 Cal.Rptr. at 362
 
 
 [9]
 In addition to the state law claim based on a descendible right of publicity, plaintiffs also alleged causes of action for false representation in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976), and state law claims of misappropriation, interference with contractual relations and unfair competition, and infringement of common-law copyright. Though appellants urge us to direct dismissal of the complaint upon reversal of the certified ruling on appeal, we prefer to have the District Court consider whether any of plaintiffs' other claims, which are not before us, survive our rejection of their right of publicity claim